IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

_____

UNITED STATES OF AMERICA,   )
                            )
            Plaintiff,      )
                            )
        v.                  )        Case No. 16-cv-1038
                            )
NGL CRUDE LOGISTICS, LLC (f/k/a Gavilon,   )
LLC) and WESTERN DUBUQUE BIODIESEL,   )        Judge
LLC,                        )
                            )
            Defendants.     )
_____)

**COMPLAINT**

The United States of America, by the authority of the Attorney General of the United

States and through the undersigned attorneys, acting at the request of the Administrator of the

United States Environmental Protection Agency ("EPA"), files this Complaint and alleges as

follows:

**NATURE OF THE ACTION**

1.      This is a civil action against NGL Crude Logistics, LLC (f/k/a/ Gavilon, LLC)

("NGL") and Western Dubuque Biodiesel, LLC ("Western Dubuque") (collectively "the

Defendants") for their violations of Section 211(*o*) of the Clean Air Act, 42 U.S.C. § 7545(*o*),

and the regulations issued thereunder at 40 C.F.R. Part 80, Subpart M.

2.      The United States seeks civil penalties and injunctive relief pursuant to Sections

205 and 211 of the Clean Air Act ("the Act"), as amended, 42 U.S.C. §§ 7524 and 7545.

## AUTHORITY, JURISDICTION, AND VENUE

3.      Authority to bring this action on behalf of the United States is vested in the United States Department of Justice by, *inter alia*, Section 305 of the Act, 42 U.S.C. § 7605, and 28 U.S.C. § 516.

4.      This Court has jurisdiction over the subject matter of this action pursuant to Sections 205 and 211 of the Act, 42 U.S.C. §§ 7524 and 7545, and 28 U.S.C. §§ 1331, 1345, and 1355.

5.      Venue in this district is proper pursuant to Section 205(b) of the Act, 42 U.S.C. § 7524(b), because Defendants committed the alleged violations in this district.

## THE PARTIES

6.      Plaintiff United States of America is acting on behalf of the United States Environmental Protection Agency.

7.      Defendant NGL Crude Logistics, LLC is a midstream energy provider that transports crude oil, and markets and supplies refined products, natural gas liquids, and other products.  NGL is a Delaware limited liability company with its headquarters in Omaha, Nebraska.

8.      From at least January 1, 2011, until March 2014, NGL was known as Gavilon, LLC.

9.      Defendant Western Dubuque Biodiesel, LLC is the owner and operator of a biodiesel plant located in Farley, Iowa.  Western Dubuque is an Iowa limited liability company with its headquarters in Farley, Iowa.

10.     Defendants are "persons" as defined in Section 302(e) of the Act, 42 U.S.C. § 7602(e).

2

## THE CLEAN AIR ACT AND THE RENEWABLE FUEL PROGRAM

11.     The Energy Policy Act of 2005 amended the Clean Air Act to add a renewable fuel program, which required EPA to promulgate regulations to increase the amount of renewable fuels used in motor vehicles to 7.5 billion gallons by 2012.  *See* Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594, 1069 (codified at Section 211(*o*) of the Act, 42 U.S.C. § 7545(*o*)).  The Energy Policy Act also required EPA to establish a credit trading program to help effectuate the renewable fuel mandate.  *See* Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. at 1071 (codified at Section 211(*o*) of the Act, 42 U.S.C. § 7545(*o*)(5)).  EPA implemented the Energy Policy Act by promulgating renewable fuel standards (now known as "RFS1") at 40 C.F.R. Part 80, Subpart K.

12.     The Energy Independence and Security Act of 2007 amended Section 211(*o*) of the Clean Air Act to increase the renewable fuel mandate to 36 billion gallons by 2022 and establish four separate categories of renewable fuels, each with a separate volume mandate and each with a specific lifecycle greenhouse gas emission threshold.  *See* Energy Independence and Security Act of 2007, Pub. L. No. 110-140, 121 Stat. 1492, 1521-24 (codified at 42 U.S.C. § 7545(*o*)(2)).  The Energy Independence and Security Act also authorized EPA to allow credits to be generated for nonroad fuel, home heating oil, and jet fuel, in addition to motor vehicle fuel. *See* Energy Independence and Security Act of 2007, Pub. L. No. 110-140, 121 Stat. at 1526 (codified at 42 U.S.C. § 7545(*o*)(5)).  Congress expanded the renewable fuel program to reduce the nation's dependence on foreign oil, increase the production of renewable fuels, and achieve significant greenhouse gas emissions reductions.  *See* Energy Independence and Security Act of 2007, Pub. L. No. 110-140, 121 Stat. 1492.  EPA promulgated additional renewable fuel

3

standards (known as "RFS2") at 40 C.F.R. Part 80, Subpart M to implement the new requirements.

13.     The RFS2 regulations define "renewable fuel" as a fuel that is 1) produced from renewable biomass, 2) used to replace or reduce the quantity of fossil fuel present in a transportation fuel, heating oil, or jet fuel, and 3) has lifecycle greenhouse gas emissions at least 20 percent less than baseline lifecycle greenhouse gas emissions, subject to some exceptions. *See* 40 C.F.R. § 80.1401 (definition of "renewable fuel").

14.     The RFS2 regulations define "transportation fuel" as "fuel for use in motor vehicles, motor vehicle engines, nonroad vehicles, or nonroad engines (except fuel for use in ocean-going vessels)." *See* 40 C.F.R. § 80.1401 (definition of "transportation fuel").

15.     The RFS2 regulations require gasoline and diesel refiners and importers (known as "obligated parties") to meet Renewable Volume Obligations ("RVOs"), which are annual renewable fuel obligations based upon a percentage of the gasoline and diesel fuel that the obligated party produces or imports into the United States. *See* 40 C.F.R. §§ 80.1406(b), 80.1407. Renewable fuel exporters are also required to meet an RVO based on the volume of renewable fuel that the exporter exports out of the United States. *See* 40 C.F.R. § 80.1430.

16.     The RFS2 regulations allow obligated parties to comply with their RVOs by producing renewable fuel themselves or by participating in a trading program. Renewable fuel production is tracked by Renewable Identification Numbers ("RINs") that are generated by renewable fuel producers and importers to represent a volume of renewable fuel. Obligated parties must demonstrate that they have retired a sufficient number of RINs (whether they produced the renewable fuel associated with the RINs themselves or whether the RINs were obtained from another entity) to meet their RVOs. *See* 40 C.F.R. § 80.1427(a)(1).

4

17.     The RFS2 regulations define a "RIN" as "a unique number generated to represent a volume of renewable fuel pursuant to §§ 80.1425 and 80.1426." *See* 40 C.F.R. § 80.1401 (definition of "renewable identification number").

18.     The RFS2 regulations establish requirements for the production and importation of renewable fuels and the generation and assignment of RINs, including the following:

- 40 C.F.R. § 80.1426(f)(1) and 40 C.F.R. § 80.1426, Table 1 identify permissible fuel types, feedstocks, and production process "pathways" that renewable fuel producers must use if they intend to generate RINs for the fuel, and the D codes associated with those pathways.

- 40 C.F.R. § 80.1426(a)(1) allows renewable fuel producers and importers to generate RINs if the fuel "qualifies for a D code pursuant to § 80.1426(f), or the EPA has approved a petition for use of a D code pursuant to § 80.1416."

- 40 C.F.R. § 80.1426(c)(6)(i) (2011) provided, at all times relevant to this Complaint, that a party is prohibited from generating RINs for a volume of renewable fuel that it produces if the fuel does not meet the requirements of 40 C.F.R. § 80.1426(a)(1)."

- 40 C.F.R. § 80.1426(c)(1) (2011) provided, at all times relevant to this Complaint, that "fuel producers and importers may not generate RINs for fuel that is not designated or intended for use as transportation fuel, heating oil, or jet fuel."

- 40 C.F.R. § 80.1460(a) provides that "no person shall produce or import a renewable fuel without complying with the requirements of § 80.1426 regarding the generation and assignment of RINs."

5

19. The RFS2 regulations establish four separate categories of renewable fuels: cellulosic biofuel, biomass-based diesel, advanced biofuel, and general renewable fuel. *See* 40 C.F.R. § 80.1405. Each category of renewable fuel is required to meet certain minimum greenhouse gas reduction standards, among other requirements. *See* 40 C.F.R. § 80.1401 (definition of "renewable fuel").

20. The RFS2 regulations designate each category of renewable fuel by a separate D code. The D code for biomass-based diesel is D4. *See* 40 C.F.R. §§ 80.1425(g)(2) and 80.1426, Table 1.

21. The RFS2 regulations define biodiesel as a mono-alkyl ester that meets American Society for Testing and Materials ("ASTM") D 6751-09 specifications. *See* 40 C.F.R. §§ 80.1401 (definition of "biodiesel") and 80.1468(b)(4). Biodiesel that qualifies for the generation of D4 RINs is referred to as "biomass-based diesel." *See* 40 C.F.R. §§ 80.1401 (definition of "biomass-based biodiesel").

22. Biodiesel must have lifecycle greenhouse gas emissions that are at least 50% less than baseline lifecycle greenhouse gas emissions from petroleum-based diesel to generate biomass-based diesel RINs. *See* 42 U.S.C. § 7545(*o*)(1)(D).

23. At all times relevant to this Complaint, the feedstocks that could be used to produce biodiesel that qualifies to generate D4 RINs pursuant to the pathway requirements in 40 C.F.R. § 80.1426(f)(1) were soy bean oil, oil from annual covercrops, algal oil, biogenic waste oils/fats/greases, non-food grade corn oil, and canola/rapeseed oil. *See* 40 C.F.R. § 80.1426(f)(1) and 40 C.F.R. § 80.1426, Table 1 (2011).

24. The production processes that can be used to produce biodiesel that qualifies to generate D4 RINs pursuant to the pathway requirements in 40 C.F.R. § 80.1426(f)(1) are

6

transesterification and some forms of hydrotreating.  *See* 40 C.F.R. § 80.1426(f)(1) and 40 C.F.R. § 80.1426, Table 1.

25.     The RFS2 regulations allow biodiesel producers to generate 1.5 RINs for each gallon of qualifying biodiesel that they produce.  *See* 40 C.F.R. § 80.1415(b).

26.     The RFS2 regulations require renewable fuel producers to register with EPA before engaging in any transaction involving RINs.  40 C.F.R. § 80.1450.  Registration requirements include, *inter alia*, identifying the location of the facility where renewable fuel will be produced, listing the feedstocks the facility is capable of utilizing, and describing the facility's renewable fuel production processes.  *See* 40 C.F.R. § 80.1450(b)(1)(i)–(ii).

27.     The RFS2 regulations define "facility" as "all of the activities and equipment associated with the production of renewable fuel starting from the point of delivery of feedstock material to the point of final storage of the end product, which are located on one property, and are under the control of the same person (or persons under common control)."  *See* 40 C.F.R. § 80.1401 (definition of "facility").

28.     Renewable fuel producers are required to submit certain information regarding each batch of renewable fuel they produce for which they generate RINs to EPA via EMTS. This information includes the name of the producer, the producer's EPA registration number, the producer's EPA facility registration number, the volume and category of fuel produced, the quantity of RINs generated for the batch, the D code of RINs generated for the batch, the type and quantity of feedstock(s) used for the batch, and the production process used for the batch.  40 C.F.R. § 80.1452(b) (2011).

29.     The RFS2 regulations establish requirements for separating RINs from the volume of renewable fuel to which they were assigned.  *See* 40 C.F.R. § 80.1429.

30.     The RFS2 regulations establish requirements for the transfer of assigned and unassigned RINs. *See, e.g.,* 40 C.F.R. § 80.1428(a)(3), (b)(3).

31.     At all times relevant to this Complaint, the RFS2 regulations provided that "[a]ny party that uses a renewable fuel in any application that is not transportation fuel, heating oil, or jet fuel, or designates a renewable fuel for use as something other than transportation fuel, heating oil, or jet fuel, must retire any RINs received with that renewable fuel and report the retired RINs in the applicable reports under § 80.1451." *See* 40 C.F.R. § 80.1429(f) (2011).

32.     Entities that sell, separate, or retire RFS2 RINs must submit information about the transaction to EPA via EMTS, including the submitting party's name and EPA registration number, the D code of the RINs, the quantity of RINs involved in the transaction, the transaction type, and the trading partner's name and EPA registration (where applicable). 40 C.F.R. § 80.1452(c).

33.     Entities that transfer ownership of renewable fuels or separated RINs must provide a product transfer document to the transferee that includes the name of the transferor and transferee, the transferor's and transferee's EPA registration numbers, the volume of renewable fuel that is being transferred, if any, the date of the transfer, the quantity of RINs transferred, the D code of the RINs, and the status of the RINs (assigned or separated). 40 C.F.R. § 80.1453(a).

34.     A RIN that is improperly generated is invalid. *See* 40 C.F.R. § 80.1431(a)(1)(ix).

35.     The RFS2 regulations prohibit a person from creating or transferring an invalid RIN. *See* 40 C.F.R. § 80.1460(b)(2).

8

36. The RFS2 regulations prohibit a person from introducing into commerce a renewable fuel that is produced from a feedstock or through a process that is not described in the person's registration information. *See* 40 C.F.R. 80.1460(b)(5).

37. The RFS2 regulations provide that an obligated party cannot meet its RVO with invalid RINs. *See* 40 C.F.R. 80.1460(c)(1).

38. The RFS2 regulations prohibit a person from causing another person to commit any prohibited act under the RFS2 regulations. *See* 40 C.F.R. § 80.1460(e).

39. The RFS2 regulations provide that no person shall fail to meet any requirement of the regulations that applies to that person. *See* 40 C.F.R. § 80.1460(f).

40. The RFS2 regulations require renewable fuel producers to maintain records related to the generation and assignment of RINs, including the batch volume in gallons, batch number, and the date of production associated with all RINs generated. *See* 40 C.F.R. § 80.1454.

41. The RFS2 regulations apply to renewable fuel produced on or after July 1, 2010; to all RINs generated on or after July 1, 2010; and to all RVOs and compliance periods starting with January 1, 2010. *See* 40 C.F.R. § 80.1400.

## GENERAL ALLEGATIONS

42. At various times from January 1, 2011 to December 31, 2011, NGL purchased more than 24 million gallons of biodiesel from various entities and sold it to Western Dubuque.

43. The biodiesel referenced in Paragraph 42 met ASTM D 6751-09 standards at the time NGL purchased it.

44. The biodiesel referenced in Paragraph 42 was a "renewable fuel" within the meaning of 40 C.F.R. 80.1401 (definition of "renewable fuel") at the time NGL purchased it.

9

45.     Approximately 36 million D4 RINs were assigned to the biodiesel referenced in Paragraph 42 at the time NGL purchased it.

46.     NGL separated most or all of the RINs assigned to the biodiesel referenced in Paragraph 42 and sold these RINs to other entities.

47.     Obligated parties used some or all of the RINs that NGL separated from the biodiesel referenced in Paragraph 42 to meet their RVOs.

48.     When it purchased the biodiesel referenced in Paragraph 42, NGL received product transfer documents identifying the fuel as biodiesel and the RINs assigned to the biodiesel as biomass-based diesel RINs.

49.     NGL designated the biodiesel referenced in Paragraph 42 as a "feedstock" when it sold the biodiesel to Western Dubuque.

50.     On February 2, 2011, February 28, 2011, March 3, 2011, March 9, 2011, May 19, 2011, and May 27, 2011, NGL sent Western Dubuque "Fatty Acid Methyl Ester Transaction Confirmations" to confirm verbal agreements to sell "fatty acid methyl ester" to Western Dubuque.  These documents referred to the "fatty acid methyl ester" as "tallow based feedstock," "soy based feedstock," "soyoil-based feedstock," or "soybean oil based feedstock."

51.     On June 1, 2011, NGL and Western Dubuque executed a Feedstock Supply Agreement, a Biodiesel Sale and Purchase Agreement, and a Master Netting, Setoff, Credit and Security Agreement that governed, among other things,  NGL's  sale of "feedstock" to Western Dubuque, and NGL's purchase of biodiesel from Western Dubuque.

52.     The June 1, 2011 Feedstock Supply Agreement defined "feedstock" as "fatty acid methyl ester for use in producing biodiesel."

53. Methyl esters are a class of chemical compounds that include, but are not limited to, biodiesel meeting the ASTM D 6751-09 specifications.

54. NGL did not retire the RINs it received with the biodiesel referenced in Paragraph 42 or report the retirement of RINs to EPA when it sold the biodiesel to Western Dubuque.

55. NGL did not provide product transfer documents identifying the biodiesel referenced in Paragraph 42 as a renewable fuel when it transferred the product to Western Dubuque.

56. NGL was Western Dubuque's only source of "feedstock" for the biodiesel Western Dubuque contends it produced or reprocessed in 2011.

57. Western Dubuque used most of the "feedstock" it purchased from NGL in 2011 to generate RINs for biodiesel it contends it produced or reprocessed at its Farley, Iowa facility.

58. Western Dubuque generated RINs for all of the biodiesel it contends it produced or reprocessed in 2011.

59. All of the biodiesel Western Dubuque sold to NGL in or around 2011 for which Western Dubuque generated RINs was derived from the "feedstock" that NGL had sold to Western Dubuque in 2011.

60. At various times from approximately January 1, 2011 to approximately December 31, 2011, Western Dubuque contends it produced or reprocessed over 900 batches of biodiesel, totaling approximately 24 million gallons, and generated approximately 36 million D4 RINs assigned to this biodiesel. Western Dubuque sold to NGL all of this biodiesel and all of the RINs assigned to this biodiesel.

61.     Western Dubuque reported to EPA that it produced the batches of biodiesel described in Paragraph 60 at its Farley, Iowa facility from soybean oil, waste oils/fats/greases, and oil from annual cover crops using the transesterification process.

62.     The total volume of biodiesel Western Dubuque sold to NGL in the transactions described in Paragraph 60 was 24,056,778 gallons.  Western Dubuque assigned 36,085,389 RINs to this biodiesel.

63.     NGL separated some or all of the RINs assigned to the biodiesel it purchased from Western Dubuque in or around 2011 and sold them to other entities.

64.     Obligated parties used some or all of the RINs that NGL separated from the biodiesel it purchased from Western Dubuque in or around 2011 to meet their RVOs.

65.     The transactions described in Paragraphs 42 through 64 resulted in the generation of approximately 36,085,389 additional D4 RINs from the biodiesel referenced in Paragraph 42.

66.     The market price for D4 RINs in 2011 ranged from $0.72 to $2.00 per RIN, with an average market price of approximately $1.30 per RIN.

67.     At all times relevant to this Complaint, Western Dubuque was registered with EPA as a renewable fuel producer.

68.     Western Dubuque's EPA registration identifies its Farley, Iowa facility as the facility where it produces biomass-based diesel (and generates RINs for that production) from soybean oil, algal oil, waste oils/fats/greases, oil from annual cover crops, and non-food grade corn oil feedstocks using the transesterification process.

69.     Transesterification is a chemical process in which a vegetable oil or animal fat oil is combined with an alcohol and a catalyst to produce biodiesel.  Transesterification produces by-products, such as glycerin, along with the biodiesel.

70.     Western Dubuque only used a small fraction of the alcohol that would have been required to transesterify the 24 million gallons of soy bean oil, algal oil, non-food grade corn oil, oil from annual covercrops, and/or biogenic waste oils/fats/greases, feedstocks that are permissible under 40 C.F.R. § 80.1426(f)(1) and 40 C.F.R. § 80.1426, Table 1, and that Western Dubuque identified in EMTS as the feedstocks it used.

71.     Western Dubuque only produced a small fraction of the glycerin that it would have produced if it had transesterified the 24 million gallons of soy bean oil, algal oil, non-food grade corn oil, oil from annual covercrops, and/or biogenic waste oils/fats/greases, feedstocks that are permissible under 40 C.F.R. § 80.1426(f)(1) and 40 C.F.R. § 80.1426, Table 1, and that Western Dubuque identified in EMTS as the feedstocks its used.

## FIRST CAUSE OF ACTION

### NGL Failed To Retire RINs
### Violation of 40 C.F.R. § 80.1429(f) (2011)

72.     Paragraphs 1 through 71 are realleged and incorporated herein by reference.

73.     At various times from January 1, 2011 to approximately December 31, 2011, NGL purchased more than 24 million gallons of biomass-based diesel (together with approximately 36 million RINs assigned to that biodiesel) from various producers and then sold it (without the assigned RINs) to Western Dubuque as a "feedstock."

74.     When NGL sold biomass-based diesel to Western Dubuque in 2011 as a "feedstock," it designated the renewable fuel for a use other than a transportation fuel, heating oil, or jet fuel.

75.     At all times relevant to this Complaint, the RFS2 regulations provided that "[a]ny party that uses a renewable fuel in any application that is not transportation fuel, heating oil, or jet fuel, or designates a renewable fuel for use as something other than transportation fuel,

13

heating oil, or jet fuel, must retire any RINs received with that renewable fuel and report the retired RINs in the applicable reports under 40 C.F.R. §§ 80.1451." *See* 40 C.F.R. § 80.1429(f) (2011).

76.     NGL did not retire the RINs it received with the biomass-based diesel it sold to Western Dubuque in 2011.

77.     NGL violated 40 C.F.R. §§ 80.1429(f) (2011) and 80.1460(f) each time it failed to retire the RINs it received with the biomass-based diesel it designated as a "feedstock."

78.     Pursuant to Sections 205 and 211 of the Act, 42 U.S.C. §§ 7524 and 7545, and 40 C.F.R. §§ 19.4, 80.1461(a)(1), and 80.1463(a), NGL is liable for civil penalties of up to $37,500 per day for each violation of the RFS2 regulations, plus the economic benefit or savings resulting from each violation, and for injunctive relief.

## SECOND CAUSE OF ACTION

### Western Dubuque Generated RFS2 RINs Using A Non-Qualifying Feedstock
### Violation of 40 C.F.R. §§ 80.1426(c)(6)(i) (2011) and 80.1460(a)

79.     Paragraphs 1 through 78 are realleged and incorporated herein by reference.

80.     From January 1, 2011 to December 31, 2011, Western Dubuque generated approximately 36 million D4 RINs for biodiesel it claims it produced from the "fatty acid methyl ester" feedstock it purchased from NGL.

81.     "Fatty acid methyl ester" is not listed as a qualifying feedstock under 40 C.F.R. § 80.1426(f)(1) and 40 CFR § 80.1426, Table 1.

82.     Western Dubuque has not sought, nor has EPA approved, a petition pursuant to 40 C.F.R. § 80.1416 to generate RINs for biodiesel produced from "fatty acid methyl ester" feedstock.

83.     Western Dubuque violated 40 C.F.R. §§ 80.1426(c)(6)(i) (2011) and 80.1460(a) each time it generated a D4 RIN for biodiesel that did not comply with the feedstock requirements of 40 C.F.R. § 80.1426(f)(1) and 40 C.F.R. § 80.1426, Table 1.

84.     Pursuant to Sections 205 and 211 of the Act, 42 U.S.C. §§ 7524 and 7545, and 40 C.F.R. §§ 19.4, 80.1461(a)(1), and 80.1463(a), Western Dubuque is liable for civil penalties of up to $37,500 per day for each violation of the RFS2 regulations, plus the economic benefit or savings resulting from each violation, and for injunctive relief.

### THIRD CAUSE OF ACTION

### Western Dubuque Generated RFS2 RINs Using A Non-Qualifying Process
### Violation of 40 C.F.R. §§ 80.1426(c)(6)(i) (2011) and 80.1460(a)

85.     Paragraphs 1 through 84 are realleged and incorporated herein by reference.

86.     From January 1, 2011 to December 31, 2011, Western Dubuque generated approximately 36 million D4 RINs for biodiesel it claims it produced using the transesterification process on the "fatty acid methyl ester" feedstock it purchased from NGL.

87.     The "fatty acid methyl ester" feedstock Western Dubuque purchased from NGL had undergone the transesterification process prior to the date Western Dubuque purchased it from NGL.

88.     Western Dubuque used only a small fraction of the alcohol, and produced only a small fraction of the by-products that would have been required to transesterify 24 million gallons of soy bean oil, algal oil, non-food grade corn oil, oil from annual covercrops, and/or biogenic waste oils/fats/greases, feedstocks that are permissible under 40 C.F.R. 80.1426(f)(1) and 40 C.F.R. § 80.1426, Table 1, and that Western Dubuque identified in EMTS as the feedstocks it used.

89.    Western Dubuque did not use transesterification or any other process identified in 40 C.F.R. § 80.1426(f)(1) and 40 C.F.R. § 80.1426, Table 1 to produce the biodiesel associated with the 36 million D4 RINs it generated in 2011.

90.    Western Dubuque has not sought, nor has EPA approved, a petition pursuant to 40 C.F.R. § 80.1416 to generate RINs for biodiesel produced from a production process other than transesterification.

91.    Western Dubuque violated 40 C.F.R. §§ 80.1426(c)(6)(i) (2011) and 80.1460(a) each time it generated a D4 RIN for biodiesel that did not comply with the process requirements of 40 C.F.R. § 1426(f)(1) and 40 C.F.R. § 80.1426, Table 1.

92.    Pursuant to Sections 205 and 211 of the Act, 42 U.S.C. §§ 7524 and 7545, and 40 C.F.R. §§ 19.4, 80.1461(a)(1), and 80.1463(a), Western Dubuque is liable for civil penalties of up to $37,500 per day for each violation of the RFS2 regulations, plus the economic benefit or savings resulting from each violation, and for injunctive relief.

### FOURTH CAUSE OF ACTION

**Western Dubuque Produced Renewable Fuel Using a Feedstock and/or a Process That Was Not Identified in Its EPA Registration**
**Violation of 40 C.F.R. § 80.1460(b)(5)**

93.    Paragraphs 1 through 92 are realleged and incorporated herein by reference.

94.    At all times relevant to this Complaint, Western Dubuque was registered with EPA pursuant to 40 C.F.R. § 80.1450 to produce biodiesel – and generate D4 RINs – using the transesterification process on the following feedstocks:  soybean oil, waste oils/fats/greases, algal oil, non-food grade corn oil, and oil from annual cover crops.

95.    Western Dubuque used "fatty acid methyl ester" feedstock to produce most or all the biodiesel it sold to NGL in or around 2011 for which it generated RINs.

16

96.     "Fatty acid methyl ester" is not a feedstock identified in Western Dubuque's EPA registration.

97.     Transesterification is the only process identified in Western Dubuque's EPA registration.

98.     Western Dubuque did not use the transesterification process to produce the biodiesel it sold to NGL in or around 2011. Western Dubuque violated 40 C.F.R. § 80.1460(b)(5) each time it introduced into commerce a renewable fuel produced from a feedstock not described in its registration information or using a process not described in its registration information.

99.     Pursuant to Sections 205 and 211 of the Act, 42 U.S.C. §§ 7524 and 7545, and 40 C.F.R. §§ 19.4, 80.1461(a)(1), and 80.1463(a), Western Dubuque is liable for civil penalties of up to $37,500 per day for each violation of the RFS2 regulations, plus the economic benefit or savings resulting from each violation, and for injunctive relief.

**FIFTH CAUSE OF ACTION**

**Western Dubuque Generated RINs for Biodiesel It Did Not Produce
Violation of 40 C.F.R. §§ 80.1452(b)(2) and (4) and 80.1460(f)**

100.    Paragraphs 1 through 99 are realleged and incorporated herein by reference.

101.    From January 1, 2011 to December 31, 2011, Western Dubuque generated approximately 36 million D4 RINs that it identified in EMTS as being generated for biodiesel that Western Dubuque contends it produced at its Farley, Iowa facility.

102.    Western Dubuque did not produce the biodiesel for which it generated D4 RINs in 2011.

103.    The biodiesel for which Western Dubuque generated D4 RINs in 2011 was biodiesel that had been previously produced by other entities at other facilities.

17

104.    The D4 RINs that Western Dubuque generated in 2011 were improperly generated because Western Dubuque identified the RINs in EMTS as being generated for biodiesel that Western Dubuque produced at its Farley, Iowa facility.

105.    Western Dubuque violated 40 C.F.R. §§ 80.1452(b)(1), (2), and (4) and 80.1460(f) by identifying itself in EMTS as the entity that produced the biodiesel and its Farley, Iowa facility as the facility at which it was produced.

106.    Pursuant to Sections 205 and 211 of the Act, 42 U.S.C. §§ 7524 and 7545, and 40 C.F.R. §§ 19.4, 1461(b)(1), and 80.1463(a), Western Dubuque is liable for civil penalties of up to $37,500 per day for each violation of the RFS2 regulations, plus the economic benefit or savings resulting from each violation, and for injunctive relief.

### SIXTH CAUSE OF ACTION

**Western Dubuque Created and Transferred Invalid RINs**
**Violation of 40 C.F.R. § 80.1460(b)(2)**

107.    Paragraphs 1 through 106 are realleged and incorporated herein by reference.

108.    The approximately 36 million D4 RINs that Western Dubuque generated in 2011 and sold to NGL were improperly generated because Western Dubuque (a) did not use a permitted feedstock (*see* Second Cause of Action), (b) did not use a permitted process (*see* Third Cause of Action), (c) generated the RINs using processes and feedstocks not listed on its EPA registration (*see* Fourth Cause of Action), and/or (d) generated RINs for renewable fuel it did not produce (*see* Fifth Cause of Action).

109.    The approximately 36 million D4 RINs that Western Dubuque generated in 2011 and sold to NGL were improperly generated because, at all times relevant to this Complaint, it was illegal to introduce into commerce any RINs generated on renewable fuel produced from an unpermitted feedstock, unpermitted process, and using processes and feedstocks not listed on a

18

person's EPA registration. The definition of a RIN specifies that it is "a unique number generated to represent a volume of renewable fuel." 40 C.F.R. § 80.1401. Since each RIN is unique to a volume of renewable fuel, these RINs were also improperly generated because Western Dubuque generated the RINs for volumes of fuel for which RINs had already been generated.

110. Improperly generated RINs are invalid under 40 C.F.R. § 80.1431(a)(1)(ix).

111. Western Dubuque violated 40 C.F.R. § 80.1460(b)(2) each time it created or transferred a RIN that is invalid pursuant to 40 C.F.R. § 80.1431.

112. Pursuant to Sections 205 and 211 of the Act, 42 U.S.C. §§ 7524 and 7545, and 40 C.F.R. §§ 19.4, 80.1461(a)(1), and 80.1463(a), Western Dubuque is liable for civil penalties of up to $37,500 per day for each violation of the RFS2 regulations, plus the economic benefit or savings resulting from each violation, and for injunctive relief.

## SEVENTH CAUSE OF ACTION

### NGL Caused Western Dubuque to Generate Invalid RINs
### Violation of 40 C.F.R. § 80.1460(e)

113. Paragraphs 1 through 112 are realleged and incorporated herein.

114. At various times from January 1, 2011 to approximately December 31, 2011, NGL purchased more than 24 million gallons of biomass-based diesel meeting ASTM D6751-09 specifications (with approximately 36 million assigned RINs) and entered into agreements with Western Dubuque under which NGL (a) sold this biodiesel (without the assigned RINs) to Western Dubuque, characterizing the biodiesel as a "feedstock"; and (b) purchased approximately 24 million gallons of biodiesel Western Dubuque allegedly produced using the same "feedstock," along with approximately 36 million RINs Western Dubuque generated from that alleged production.

19

115.    NGL's actions, including those identified in Paragraph 114, caused Western

Dubuque to (a) use an unpermitted feedstock (*see* Second Cause of Action), (b) use an

unpermitted process (*see* Third Cause of Action), (c) generate RINs using processes and

feedstocks not listed on Western Dubuque's registration (*see* Fourth Cause of Action), and (d)

create and transfer RINs for renewable fuel that Western Dubuque did not produce (*see* Fifth

Cause of Action), all of which are prohibited acts in violation of 40 C.F.R. § 80.1460(e).

116.    Pursuant to Sections 205 and 211 of the Act, 42 U.S.C. §§ 7524 and 7545, and 40

C.F.R. §§ 19.4, 80.1461(a)(2), and 80.1463(a), NGL is liable for civil penalties of up to $37,500

per day for each violation of the RFS2 regulations, plus the economic benefit or savings resulting

from each violation, and for injunctive relief.

## EIGHTH CAUSE OF ACTION

### NGL Transferred Invalid RINs
### Violation of 40 C.F.R. § 80.1460(b)(2)

117.    Paragraphs 1 through 116 are realleged and incorporated herein.

118.    At various times from January 1, 2011 to on or around December 31, 2011, NGL

purchased approximately 24 million gallons of biodiesel with approximately 36 million assigned

D4 RINs from Western Dubuque.

119.    The approximately 36 million D4 RINs assigned to the biodiesel NGL

purchased from Western Dubuque in or around 2011 were improperly generated within

the meaning of 40 C.F.R. § 80.1431(a)(1)(ix) because Western Dubuque (a) did not use a

permitted feedstock (*see* Second Cause of Action), (b) did not use a permitted process

(*see* Third Cause of Action), (c) generated RINs using processes and feedstocks not listed

on its EPA registration (*see* Fourth Cause of Action), and/or (d) created and transferred

RINs for renewable fuel that it did not produce (*see* Fifth Cause of Action).

120. Improperly generated RINs are invalid under 40 C.F.R. § 80.1431(a)(1)(ix).

121. NGL transferred most or all of the 36 million D4 RINs assigned to the biodiesel it purchased from Western Dubuque in or around 2011 to other entities.

122. NGL violated 40 C.F.R. § 80.1460(b)(2) each time it transferred an invalid RIN.

123. Pursuant to Sections 205 and 211 of the Act, 42 U.S.C. §§ 7524 and 7545, and 40 C.F.R. §§ 19.4 80.1461(a)(1), and 80.1463(a), NGL is liable for civil penalties of up to $37,500 per day for each violation of the RFS2 regulations, plus the economic benefit or savings resulting from each violation, and for injunctive relief.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, United States of America, respectfully requests that this Court:

A. Enter an order declaring that the approximately 36 million D4 RINs that Western Dubuque generated in 2011 using biodiesel provided by NGL as a "feedstock, " are invalid;

B. Enter an order requiring the Defendants to retire and replace the approximately 36 million D4 RINs that Western Dubuque generated in 2011 using biodiesel provided by NGL as a "feedstock" to offset the harm caused by their violations;

C. Enter a judgment that NGL is liable to the United States for civil penalties pursuant to Section 211(d) of the Act, 42 U.S.C. § 7545(d), of not more than $37,500 for every day of such violation and the amount of economic benefit or savings resulting from the violation;

D. Enter a judgment that Western Dubuque is liable to the United States for civil penalties pursuant to Section 211(d) of the Act, 42 U.S.C. § 7545(d), of not more than $37,500

Case 2:16-cv-01038-LRR   Document 1   Filed 10/04/16   Page 21 of 23

or every day of such violation and the amount of economic benefit or savings resulting from the violation; and

E. Grant the United States such other relief as the Court deems just and proper.

Respectfully Submitted,

JOHN C. CRUDEN
Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice


 /s/ James D. Freeman
JAMES D. FREEMAN
Senior Attorney
Environmental Enforcement Section
United States Department of Justice
999 18th Street, South Terrace, Suite 370
Denver, Colorado 80202
Telephone: (303) 844-1489
Facsimile: (303) 844-1350
James.Freeman2@usdoj.gov


 /s/ Alexandra B. Sherertz
ALEXANDRA B. SHERERTZ
Trial Attorney
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 514-0414
Alexandra.Sherertz@usdoj.gov


KEVIN W. TECHAU
United States Attorney
Northern District of Iowa

 /s/Matthew J. Cole
MATTHEW J. COLE
Assistant United States Attorney
Northern District of Iowa

22

OF COUNSEL

JEFF KODISH
Attorney-Advisor
Fuels Team Leader
Office of Enforcement & Compliance Assurance
Air Enforcement Division
Western Field Office (8MSU)
1595 Wynkoop Street
Denver, Colorado 80202

MATTHEW KRYMAN
Attorney-Advisor
Office of Enforcement & Compliance Assurance
Air Enforcement Division
Western Field Office (8MSU)
1595 Wynkoop Street
Denver, Colorado 80202