**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
| Plaintiff, | | No. 16-CV-1038-LRR |
| vs. | | **ORDER** |
| NGL CRUDE LOGISTICS, LLC (f/k/a Gavilon, LLC), | | |
| Defendant. | | |

_____

*TABLE OF CONTENTS*

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.     RELEVANT PROCEDURAL HISTORY  . . . . . . . . . . . . . . . . . . . . . . . . . **2**

III.    FACTUAL BACKGROUND  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

       A.    *Parties* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**
       B.    *Renewable Fuel Program*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**
       C.    *2011 Transactions* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **5**
       D.    *Alleged Violations* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**

IV.     LEGAL STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

V.      ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

       A.    *Scope of Regulations* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**
       B.    *Count 7* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **14**
            1.   *Causation*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **14**
            2.   *Prohibited acts* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **15**
       C.    *Count 8* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**
       D.    *Count 1* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17**
       E.    *Injunctive Relief* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**

VI.     CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25**

## I. INTRODUCTION

The matter before the court is Defendant NGL Crude Logistics, LLC's ("NGL") "Rule 12(b)(6) Motion to Dismiss Plaintiff's Amended Complaint" ("Motion") (docket no. 25).

## II. RELEVANT PROCEDURAL HISTORY

On January 9, 2017, Plaintiff United States of America ("the government") filed an Amended Complaint (docket no. 21) against Defendants NGL and Western Dubuque Biodiesel, LLC ("Western Dubuque"). The Amended Complaint alleges violations of the Clean Air Act and related regulations, and seeks civil penalties and injunctive relief. *See generally* Amended Complaint. Specifically, the government alleges that: (1) NGL failed to retire Renewable Identification Numbers ("RINs") associated with a quantity of biodiesel, in violation of 40 C.F.R. § 80.1429(f) (2011);[1] (2) Western Dubuque generated RINs using a non-qualifying feedstock, in violation of 40 C.F.R. §§ 80.1426(c)(6)(i) & 80.1460(a); (3) Western Dubuque generated RINs using a non-qualifying process, in violation of 40 C.F.R. §§ 80.1426(c)(6)(i) & 80.1460(a); (4) Western Dubuque used a feedstock and/or process that was not registered with the Environmental Protection Agency ("EPA") to use, in violation of 40 C.F.R. § 80.1460(b)(5); (5) Western Dubuque improperly identified RINs in the EPA's reporting system, in violation of 40 C.F.R. §§ 80.1452(b)(2), (4) & 80.1460(f); (6) Western Dubuque created and transferred invalid RINs, in violation of 40 C.F.R. § 80.1460(b)(2); (7) NGL caused Western Dubuque to commit prohibited acts, in violation of 40 C.F.R. § 80.1460(e); and (8) NGL transferred invalid RINs, in violation of 40 C.F.R. § 80.1460(b)(2). *See id.* ¶¶ 72-125. On April 11, 2017, the court approved an amended consent decree (docket no. 48), which resulted in

---

[1] Because the Amended Complaint alleges conduct occurring in 2011, all citations to renewable fuel program regulations will refer to the regulations as they existed in 2011, except where explicitly noted. NGL filed the 2011 versions of the relevant regulations as Appendix A to the NGL Brief (docket no. 25-1).

the settlement of the government's claims against Western Dubuque.

On January 23, 2017, NGL filed the Motion. On February 17, 2017, the government filed a Resistance (docket no. 46). On March 2, 2017, NGL filed a Reply (docket no. 45). On Monday, May 22, 2017, the court heard oral argument from the parties regarding the issues raised in the Motion. *See* May 22, 2017 Minute Entry (docket no. 51). The matter is fully submitted and ready for decision.

### III.  FACTUAL BACKGROUND

Accepting all factual allegations in the Amended Complaint as true, and drawing all reasonable inferences in favor of the government, the facts are as follows.

### A.  Parties

The government brings the instant action on behalf of the EPA.

NGL is a "midstream energy provider that transports crude oil, and markets and supplies refined product, natural gas liquids, and other products." Amended Complaint ¶ 7. During the times relevant to the events alleged in the Amended Complaint, NGL was known as Gavilon, LLC.

Western Dubuque owns and operates a biodiesel plant in Farley, Iowa. *Id.* ¶ 9.

### B.  Renewable Fuel Program

In the Energy Policy Act of 2005, Congress amended the Clean Air Act to create a renewable fuel program to promote the availability and use of renewable fuel in the United States. *See* Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 (codified at 42 U.S.C. § 7545(o)). The Energy Policy Act required the EPA to promulgate renewable fuel standards, *see* 40 C.F.R. §§ 80.1100-1167, and a "credit trading program" to implement the renewable fuel program, *see* Energy Policy Act, 119 Stat. 594 (codified at 42 U.S.C. § 7545(o)(5)). In the Energy Independence and Security Act of 2007, Congress amended the Clean Air Act to refine the operation of the renewable fuel program. *See* Energy Indep. & Sec. Act of 2007, Pub. L. No. 110-140, 121 Stat. 1492

(codified at 42 U.S.C. § 7545(o)(2)).  This resulted in the EPA promulgating additional renewable fuel standards.  *See* 40 C.F.R. §§ 80.1400-1474.

The renewable fuel program requires gasoline and diesel producers and importers (called "obligated parties") to meet Renewable Volume Obligations ("RVOs").  *See* 40 C.F.R. § 80.1406.  Under the RVOs, a percentage of all fuel that an obligated party produces or imports must be a renewable fuel.  *See id.* § 80.1407.  RINs are assigned by volume to renewable fuel that is produced in or imported to the United States.  Obligated parties satisfy their RVOs by "retiring" a sufficient quantity of RINs, demonstrating that they have either produced or traded in the requisite quantities of renewable fuel.  *Id.* § 80.1427.

Numerous regulations govern the renewable fuel program and the assignment of RINs.  In the Amended Complaint, the government alleges[2] that, during the relevant time period, various regulations: (1) identified the substances and processes that must be used to produce renewable fuels capable of generating RINs, *id.* § 80.1426 Table 1; (2) permitted the generation of RINs for renewable fuel that qualified for a D code under existing regulations or was approved for a D code after petition to the EPA, *id.* § 80.1426(a)(1); (3) prohibited the generation of RINs for any fuel that did not qualify for a D code under the two avenues provided, *id.* § 80.1426(c)(6)(i); (4) prohibited the generation of RINs for any fuel that is not designated or intended for use as transportation fuel, heating oil or jet fuel, *id.* § 80.1426(c)(1); and (5) prohibited the production or importation of renewable fuels without complying with the RIN-generation scheme, *id.* § 80.1460(a).  A "D code" represents the category to which a renewable fuel belongs—for example, the D code for biodiesel is D4.  Amended Complaint ¶ 20.  For a renewable fuel

---

[2] In the Amended Complaint, the government alleges particular meanings of various regulations.  However, the precise scope and meanings of the regulations are central to the merits of the Motion and will be addressed below.

to qualify for a particular D code, it must be produced using certain "feedstock" substances and certain production processes. 40 C.F.R. § 80.1426 Table 1.

Renewable fuel producers are required to register with the EPA and submit certain information. For example, producers must inform the EPA of the production processes and feedstocks that they are capable of utilizing at their facility. *Id.* §§ 80.1450(b)(1)(i)-(ii). Likewise, producers must report to the EPA regarding each batch of renewable fuel produced at their facility that generates RINs. Such reports must include the producer's name and EPA registration number, the facility's EPA registration number, the volume and category of fuel produced, the quantity of RINs generated, the D code to which the fuel belongs, the type and quantity of feedstock and the production process used to produce the fuel. *Id.* § 80.1452(b).

The renewable fuel program also regulates the transfer of renewable fuel and RINs. Obligated parties may transfer RINs while attached to the renewable fuel that generated them or they may separate RINs from a batch of renewable fuel and transfer the separated RINs by themselves. *Id.* §§ 80.1428(a)(3), (b)(3). Transfer of RINs—whether separated or attached to renewable fuel—must be reported to the EPA. Such reports must contain specific information regarding the obligated parties involved in the transfer and the nature and quantity of the RINs. *Id.* § 80.1452(c). Additionally, a transferor of RINs must provide a product transfer document to the transferee containing information similar to that provided to the EPA. *Id.* § 80.1453(a). Any RIN generated in noncompliance with the regulations governing the renewable fuel program is deemed invalid and cannot be transferred. *Id.* § 80.1460(b). An obligated party that uses or designates a renewable fuel for a purpose other than transportation fuel, heating oil or jet fuel must retire all RINs associated with the renewable fuel and report it to the EPA. *Id.* § 80.1429(f).

### C. 2011 Transactions

In 2011, NGL purchased approximately 24 million gallons of biodiesel, as well as

the approximately 36 million D4 RINs assigned to the biodiesel. Amended Complaint ¶¶ 42-45. NGL separated the RINs associated with the biodiesel and sold them to other obligated parties. *Id.* ¶ 46. The obligated parties that purchased RINs from NGL retired some or all of the RINs to comply with their RVOs. *Id.* ¶ 47.

After separating and selling the associated RINs, NGL sold the approximately 24 million gallons of biodiesel (without RINs) to Western Dubuque. *Id.* ¶ 42, 49. When it sold the biodiesel to Western Dubuque, NGL designated it as feedstock. *Id.* ¶¶ 49-52. Western Dubuque then used the purported feedstock to produce approximately 24 million gallons of biodiesel, generating approximately 36 million D4 RINs. *Id.* ¶¶ 56-60. Western Dubuque reported to the EPA that the biodiesel it produced derived from "soybean oil, waste oils/fats/greases, and oil from annual cover crops" and that it used a production process called transesterification. *Id.* ¶ 61. However, the materials used and the byproducts generated at Western Dubuque's facility were inconsistent with Western Dubuque's reported feedstock and production process. *Id.* ¶¶ 70-71.

Western Dubuque sold the biodiesel and associated RINs back to NGL. *Id.* ¶ 60. NGL proceeded to separate the RINs and sell them to other obligated parties. *Id.* ¶ 63. The obligated parties retired some or all of the RINs to comply with their RVOs. *Id.* ¶ 64. The government alleges that the transactions between NGL and Western Dubuque resulted in the generation of approximately 36 million invalid RINs. *Id.* ¶ 65.

### D. Alleged Violations

In its first claim against NGL (Count 1 of the Amended Complaint), the government alleges that, after designating its quantity of biodiesel as a feedstock, NGL failed to retire the RINs that it had received with the biodiesel, as required under 40 C.F.R. § 80.1429(f). *Id.* ¶¶ 73-74. According to the government, retirement of the RINs was required because any party that "designates a renewable fuel for use as something other than transportation fuel, heating oil, or jet fuel, must retire any RINs received with that renewable fuel and

6

report the retired RINs" to the EPA. *Id.* ¶ 75 (quoting 40 C.F.R. § 80.1429(f)).

In its second claim against NGL (Count 7 of the Amended Complaint), the government alleges that NGL "caused" Western Dubuque to commit unlawful acts in connection with the biodiesel transactions at issue, in violation of 80 C.F.R. § 80.1460(e). *Id.* ¶ 114. The government alleges the following actions by NGL in support of this claim: (1) developing a plan to duplicate RINs through the sale and repurchase of biodiesel; (2) recruiting Western Dubuque to participate in the plan; (3) serving as the primary drafter of the transactions at issue; (4) providing legal analysis to Western Dubuque implying that the transactions were lawful; (5) agreeing to "hold Western Dubuque harmless" if the RINs generated through their transactions were invalidated by the EPA; and (6) agreeing in 2013 to reimburse Western Dubuque for all expenses associated with EPA audits and/or inquiry arising from the transactions. *Id.* ¶ 116. According to the government, these and other actions by NGL caused Western Dubuque to: (1) use an unpermitted feedstock, as alleged in Count 2 of the Amended Complaint; (2) use an unpermitted process, as alleged in Count 3; (3) improperly generate RINs and produce biodiesel without accurately reporting to the EPA, as alleged in Count 4; (4) misidentify the facility wherein the RIN-generating biodiesel was produced, as alleged in Count 5; and/or (5) create and transfer invalid RINs, as alleged in Count 6. *Id.* ¶ 117.

In its third claim against NGL (Count 8 of the Amended Complaint), the government alleges that NGL transferred invalid RINs, in violation of 40 C.F.R. § 80.1460(b)(2). *Id.* ¶ 121. Specifically, the government alleges that NGL unlawfully transferred to other obligated parties the improperly generated RINs assigned to the biodiesel purportedly produced by Western Dubuque. *Id.*

Due to the alleged violations, the government seeks civil penalties, as well as injunctive relief requiring NGL and Western Dubuque to retire approximately 36 million valid RINs "to offset the harm caused by the violations." *Id.* at 23 (Request for Relief).

## *IV.  LEGAL STANDARD*

NGL seeks dismissal of the Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  *See* Motion at 1.

Rule 12(b)(6) provides for dismissal of a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. (12)(b)(6).  When analyzing a Rule 12(b)(6) motion, the court must accept all of the factual allegations in the complaint as true.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Id.*  (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Varga v. U.S. Bank Nat'l Ass'n*, 764 F.3d 833, 838-39 (8th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).  This standard requires a complaint to "contain factual allegations sufficient 'to raise a right to relief above the speculative level.'"  *Parkhurst v. Tabor*, 569 F.3d 861, 865 (8th Cir. 2009) (quoting *Twombly*, 550 U.S. at 555).  "Where the allegations show on the face of the complaint [that] there is some insuperable bar to relief, dismissal under Rule 12(b)(6) is appropriate."  *Benton v. Merrill Lynch & Co., Inc.*, 524 F.3d 866, 870 (8th Cir. 2008).

## *V.  ANALYSIS*

In the Motion, NGL seeks dismissal of all the claims against it.  *See* "Memorandum of Law in Support of the Motion" ("NGL Brief") (docket no. 25-4) at 7.  In support of the Motion, NGL argues that: (1) with respect to all claims against it, NGL's conduct was lawful under the renewable fuel program regulations as they existed in 2011, NGL Brief at 18-19; (2) with respect to Count 7, the government has failed to plead sufficient facts that NGL "caused" Western Dubuque's violations, *id.* at 19-21; (3) with respect to Count 7, even if NGL caused certain conduct by Western Dubuque, the government has failed

to plead sufficient facts that Western Dubuque in fact violated any of the regulations at issue, *id*. at 21-25; (4) with respect to Count 8, the government has failed to plead sufficient facts that the RINs NGL transferred were invalid, *id*. at 25; (5) with respect to Count 1, NGL was under no obligation to retire the RINs generated with the biodiesel that it designated as feedstock, *id*. at 26-28; and (6) with respect to the requested relief, the government is not entitled to injunctive relief requiring NGL to purchase and retire RINs sufficient to offset the harm from the alleged violations, *id*. at 28-30. The court shall address each argument in turn.

### *A. Scope of Regulations*

NGL argues that the overarching conduct alleged in the Amended Complaint—that NGL and Western Dubuque generated new RINs from biodiesel feedstock that had previously generated RINs—was lawful at the time. *See id*. at 18-19. In 2011, when NGL and Western Dubuque allegedly engaged in the conduct at issue, EPA regulations provided as follows:

> (a) *General requirements.*—(1) To the extent permitted under . . . this section, producers and importers of renewable fuel must generate RINs to represent that fuel if the fuel:
>
> (i) Qualifies for a D code . . . , or EPA has approved a petition for use of a D code . . .; and
>
> (ii) Is demonstrated to be produced from renewable biomass pursuant to the reporting requirements . . . and the recordkeeping requirements of [the renewable fuel program].
>
> . . .
>
> [(c)](6) A party is prohibited from generating RINs for a volume of fuel that it produces if:
>
> (i) The fuel does not meet the requirements of paragraph (a)(1) of this section; or

(ii) The fuel has been produced from a chemical conversion process that uses another renewable fuel as a feedstock, the renewable fuel used as a feedstock was produced by another party, and RINs were received with the renewable fuel.

40 C.F.R. §§ 80.1426(a)(1), (c)(6). NGL argues that, because Western Dubuque did not receive RINs with the biodiesel it purchased from NGL, Western Dubuque was not prohibited from using the biodiesel as a feedstock to produce new RIN-generating biodiesel under § 80.1426(c)(6)(ii). NGL Brief at 18-19. The government argues that Western Dubuque used an impermissible feedstock and process to produce the biodiesel and, therefore, the biodiesel did not qualify for a D code and was prohibited from generating RINs under § 80.1426(c)(6)(i). Resistance at 11-12 (citing 40 C.F.R. § 80.1426 Table 1). According to the government, it is irrelevant whether Western Dubuque received RINs when it purchased the biodiesel feedstock from NGL—in either case, it was incapable of generating RINs because it did not qualify for a D code. *See id.* at 12.

An agency's interpretation of its own regulation is generally controlling. *See Auer v. Robbins*, 519 U.S. 452, 461 (1997); *accord Northshore Min. Co. v. Sec'y of Labor*, 709 F.3d 706, 709 (8th Cir. 2013); *Fast v. Applebee's Int'l, Inc.*, 638 F.3d 872, 878 (8th Cir. 2011). However, this so-called *Auer* deference does not apply if the agency's interpretation: (1) is "plainly erroneous or inconsistent with the regulation"; (2) "does not reflect the agency's fair and considered judgment on the matter in question"—such as when it "conflicts with a prior interpretation" or appears to be a mere "convenient litigating position" or "*post hoc* rationalization"; or (3) results in unfair surprise. *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 132 S. Ct. 2156, 2166-67 (2012) (internal citations and quotation marks omitted). *Auer* deference applies "only when the language of the regulation is ambiguous." *Northshore*, 709 F.3d at 709 (quoting *Fast*, 638 F.3d at 878). Ambiguity of a regulation is a matter of statutory—or regulatory—construction. *See United States v. White Plume*, 447 F.3d 1067, 1074 (8th Cir. 2006) ("Under statutory

interpretation, a statute is ambiguous if it is 'capable of being understood in two or more possible senses or ways.'" (internal quotation marks omitted) (quoting *Chickasaw Nation v. United States*, 534 U.S. 84, 90 (2001))); *see also Northshore*, 709 F.3d at 709 (applying rules of statutory construction to the interpretation of a regulation).

Looking to the plain language of the regulation, the court keeps in mind "that the words of a [regulation] must be read in their context and with a view to their place in the overall [regulatory] scheme." *Northshore*, 709 F.3d at 710 (quoting *Davis v. Mich. Dep't of the Treasury*, 489 U.S. 803, 809 (1989)). Here, NGL would have the court interpret § 80.1426(c)(6)(ii) in isolation from the rest of § 80.1426. *See* NGL Brief at 18-19 (staking its argument solely on an interpretation of § 80.1426(c)(6)(ii)). Interpreted in such a way, Western Dubuque's generation of RINs for fuel that it produced with biodiesel feedstock would arguably be permitted because Western Dubuque did not receive RINs when it purchased the biodiesel feedstock from NGL. But this interpretation ignores other essential provisions of the regulation. Section 80.1426 identifies *two* scenarios in which a party is prohibited from generating RINs. A party is prohibited from generating RINs if the fuel it produces "does not meet the requirements of [§ 80.1426(a)(1)]" *or* if it uses renewable fuel as a feedstock "and RINs were received with the renewable fuel." 40 C.F.R. § 80.1426(c)(6)(i)-(ii). In the Amended Complaint, the government does not base its claims on the second scenario,[3] about which NGL complains, but instead bases its claims on the first scenario. Specifically, the government contends that the fuel did not qualify for a D code because it was produced with a feedstock and process that were not approved under § 80.1426 Table 1. *See* Amended Complaint ¶¶ 79-92 (alleging violations

_____

[3] In the Resistance, the government nevertheless argues that both § 80.1426(c)(6)(i) and § 80.1426(c)(6)(ii) independently prohibited Western Dubuque's alleged conduct. *See* Resistance at 14-15. Because the court finds that § 80.1426(c)(6)(i) plainly prohibited Western Dubuque's alleged conduct, the court declines to consider whether § 80.1426(c)(6)(ii) further prohibited such conduct.

of § 80.1426(c)(6)(i) for using a "non-qualifying" feedstock and process); *see also* 40 C.F.R. § 80.1426 Table 1 (listing the feedstock and production processes that qualify a fuel for a D code).  Viewing (c)(6)(i) and (c)(6)(ii) together, the language of § 80.1426 unambiguously prohibited Western Dubuque's generation of RINs for fuel produced using a feedstock and process that did not qualify for a D code, as alleged in the Amended Complaint.

NGL resists this plain reading on two grounds.  First, NGL argues that, by interpreting § 80.1426(c)(6)(i) to prohibit RIN generation where biodiesel is used as a feedstock, § 80.1426(c)(6)(ii) is rendered superfluous because it contemplates a scenario (the generation of RINs for fuel produced from a renewable fuel feedstock) that could never occur under § 80.1426(c)(6)(i).  *See* NGL Brief at 22.  However, that is not the case.  Although a fuel produced from a renewable fuel feedstock would not qualify for a D code under the table provided at § 80.1426, it could nevertheless qualify for a D code upon petition to the EPA.  *See* 40 C.F.R. § 80.1416 (providing a mechanism for a party to petition for a D code for fuels that would otherwise not qualify).  If a party successfully petitions for a D code for a fuel produced with a renewable fuel feedstock, then § 80.1426(c)(6)(ii) would not, in fact, be superfluous: even after successfully petitioning for a D code, the party would be prohibited from generating RINs if it received RINs when procuring the feedstock from another party.  Therefore, to give meaning to all interrelated provisions, § 80.1426(c)(6) must be read to prohibit RIN generation in two scenarios: (1) where a fuel plainly fails to qualify for a D code under the standards enumerated at § 80.1426 Table 1 or under the petition mechanism at § 80.1416, *see* 40 C.F.R. § 80.1426(c)(6)(i); and (2) where fuel produced with renewable fuel feedstock gains EPA approval for a D code, but the party received RINs when it procured the feedstock from another party, *see* 40 C.F.R. § 80.1426(c)(6)(ii).  Under this interpretation, no provision is rendered superfluous.

Second, NGL argues that various changes to the renewable fuel program regulations imply that the "2011 regulations were written to encourage [Western Dubuque's] conduct." *See* NGL Brief at 18-19. NGL points to the fact that pre-2011 regulations categorically prohibited RIN generation where renewable fuel was a feedstock—whereas the 2011 prohibition applied only if the renewable fuel feedstock was received with RINs. NGL argues that the change in language suggests tacit endorsement of RIN generation for fuels produced with renewable fuel feedstock that was not received with RINs. *See id.* NGL further points to the fact that post-2011 regulations reverted to a categorical prohibition on RIN generation where renewable fuel was a feedstock, and emphasizes EPA statements that the 2011 regulations "were causing confusion." *See id.* at 19. NGL argues that this context reveals that the 2011 regulations were, "at minimum, not clear." *Id.* NGL's argument fails because resort to "the condition of affairs which led to [the challenged regulation's] enactment" cannot trump the plain and unambiguous construction of § 80.1426(c)(6) identified above. *See Dowd v. United Steelworkers of Am., Local No. 286*, 253 F.3d 1093, 1099 (8th Cir. 2001) (quoting *United States v. McAllister*, 225 F.3d 982, 986 (8th Cir. 2000)). Additionally, to whatever extent the pre- and post-2011 regulations could affect an interpretation of § 80.1426(c)(6)(ii), they do nothing to affect an interpretation of § 80.1426(c)(6)(i), which would nevertheless prohibit the generation of RINs for a fuel that failed to qualify for a D code. Lastly, even if the pre- and post-2011 regulations could somehow render § 80.1426(c)(6) ambiguous, the court finds that the EPA's interpretation of the provision would be entitled to *Auer* deference. In any event, § 80.1426(c)(6) prohibited NGL and Western Dubuque's conduct.

Because the court concludes that the underlying conduct alleged in the Amended Complaint was unlawful under the relevant 2011 renewable fuel program regulations, the court proceeds to determine whether the Amended Complaint sufficiently states claims against NGL.

### B.  Count 7

In Count 7, the government alleges that NGL unlawfully "caused" Western Dubuque to engage in acts prohibited by the renewable fuel program.  *See* Amended Complaint ¶¶ 113-18.  NGL argues that the government has failed to plead sufficient facts that: (1) NGL caused Western Dubuque to engage in any conduct, *see* NGL Brief at 19-21, and (2) Western Dubuque in fact engaged in prohibited acts, *see id.* at 21-25.

### 1.  Causation

NGL argues that the government has failed to plead sufficient facts that NGL caused Western Dubuque to engage in the conduct described in the Amended Complaint.  *See id.* at 19-21.  Specifically, NGL argues that the Amended Complaint contains no factual allegation that NGL controlled, coerced, misled or otherwise dictated any of Western Dubuque's actions.  *Id.* at 20.

Section 80.1460(e) provides that "[n]o person shall cause another person to commit an act in violation of any prohibited act under this section."  40 C.F.R. § 80.1460(e).  Renewable fuel program regulations do not define the meaning of the term "cause."  "When a word is not defined by statute, [courts] normally construe it in accord with its ordinary or natural meaning."  *United States v. Jungers*, 702 F.3d 1066, 1071 (8th Cir. 2013) (quoting *Smith v. United States*, 508 U.S. 223, 228 (1993)).  To "cause" ordinarily means "[t]o bring about or effect."  Cause, *Black's Law Dictionary* (10th ed. 2014); *see also* Cause, v.1, *Oxford English Dictionary Online*, http://www.oed.com/view/ Entry/29148?rskey= 8FOahC& result=2#eid (last visited Apr. 24, 2017) ("To be the cause of; to effect, bring about, produce, induce, make.").  Therefore, giving "cause" its ordinary meaning, the government need not allege that NGL controlled, coerced, misled or dictated Western Dubuque's actions, *see* NGL Brief at 20, but need only allege that NGL brought about or effected Western Dubuque's actions.

In the Amended Complaint, the government alleges that NGL: (1) "developed the

14

plan" to detach RINs from a quantity of biodiesel and transfer the biodiesel to another party as a feedstock to generate additional RINs; (2) "recruited Western Dubuque to participate" in the plan; (3) drafted the agreements between it and Western Dubuque; (4) "provided Western Dubuque with a legal analysis" leading Western Dubuque to believe that NGL's plan was lawful; and (5) agreed to "hold Western Dubuque harmless" if the RINs generated by Western Dubuque were deemed invalid. Amended Complaint ¶ 116. These facts sufficiently allege that NGL brought about or effected Western Dubuque's actions. Particularly, these allegations support a conclusion that NGL actively recruited Western Dubuque to take the actions that it did and affirmatively guided Western Dubuque through such actions. Accepting all allegations as true, the Amended Complaint plausibly demonstrates that NGL caused Western Dubuque's actions with respect to the unlawful generation of RINs.

### 2.     *Prohibited acts*

NGL argues that, even if the Amended Complaint sufficiently alleges that it caused Western Dubuque to take certain actions, it nevertheless fails to allege that such actions were prohibited. *See* NGL Brief at 21-25. Count 7 identifies each of the claims against Western Dubuque as prohibited acts caused by NGL. *See* Amended Complaint ¶ 117. NGL contends that the allegations against Western Dubuque do not, in fact, describe prohibited acts under the renewable fuel program. *See* NGL Brief at 21-25. With respect to Counts 2, 3, 4 and 6 against Western Dubuque, NGL argues that the government's allegations are insufficient because they allege that Western Dubuque "contends" it produced the biodiesel that generated invalid RINs, but does not allege that it actually produced the biodiesel. *See id.* at 21-23 (discussing Counts 2 through 4); *id.* at 25 (arguing that Count 6 fails on the same grounds as Counts 2 and 3). NGL claims that this distinction is fatal because the regulations at issue address fuel that is "produced" by a party. *Id.* at 22-23.

The court declines to assign significance to the semantic distinction identified by NGL. *Cf. Arnold v. AT&T, Inc.*, No. 4:10-CV-2429-SNLJ, 2012 WL 1441417, at *7 (E.D. Mo. Apr. 26, 2012) (refusing to entertain a plaintiff's semantic gloss on a complaint's wording where it conflicts with a practical reading of the complaint as a whole). A practical reading of the Amended Complaint makes clear that NGL purchased biodiesel, which was produced by an unknown party, and sold the biodiesel to Western Dubuque, which used it as a feedstock to produce a fuel that was prohibited from generating RINs. By alleging that Western Dubuque "contends" that it produced biodiesel, the government certainly does not foreclose the possibility that Western Dubuque produced biodiesel. Further, the allegation appropriately accounts for the peculiarities of the circumstances: Western Dubuque reported to the EPA that it produced biodiesel (and it generated RINs accordingly), but the biodiesel used as feedstock had been previously produced by a separate party and, to whatever extent Western Dubuque used that biodiesel to refine or produce a quantity of biodiesel, it did so using a feedstock and process unrecognized by the renewable fuel program. *See generally* Amended Complaint ¶¶ 79-100. Such facts plausibly state a claim that Western Dubuque engaged in acts prohibited under renewable fuel program regulations, particularly those prohibited acts identified in Counts 2, 3, 4 and 6.[4] In view of these specifically alleged facts, it is unnecessary for the government to recite magic words that Western Dubuque "produced"—rather than "contend it produced"—the fuel at issue. *See Iqbal*, 556 U.S. at 678-79 (observing that the pleading requirements do not require "hypertechnical" allegations, and that stating a plausible claim for relief is "a context-specific task").

Accordingly, the Amended Complaint sufficiently alleges prohibited acts taken by

---

[4] Because the court finds that the allegations regarding these four claims sufficiently plead prohibited acts taken by Western Dubuque, the court declines to consider whether Count 5 sufficiently pleads further prohibited acts.

Western Dubuque. Because it also sufficiently alleges that NGL caused the prohibited acts, the Amended Complaint sufficiently alleges a claim against NGL with respect to Count 7.

### C. Count 8

In Count 8, the government alleges that NGL unlawfully transferred invalid RINs when it separated the RINs generated for the fuel produced by Western Dubuque and sold them to other obligated parties. Amended Complaint ¶¶ 119-25. NGL argues that Count 8 fails to state a claim because the government does not allege that Western Dubuque actually produced the fuel for which it generated RINs, *see* NGL Brief at 25 (arguing that Count 8 fails because the government "has not pled a required element of Counts 2 and 3"—namely, that Western Dubuque produced the fuel at issue), and because the RINs generated by Western Dubuque were not invalid under the 2011 regulations, *see id.* (arguing that the "the 2011 version of 80.1426(c)(6)(ii) permitted" Western Dubuque's generation of RINs and the "EPA did not prohibit such conduct until January 2012").

NGL's arguments regarding Count 8 mirror its prior arguments. As discussed above, the government's allegation that Western Dubuque "contends" it produced fuel does not defeat the underlying claims that Western Dubuque generated RINs for non-qualifying fuel, and § 80.1426(c)(6) plainly prohibited such actions. Because improperly generated RINs are invalid, *see* § 80.1431(a), and because the Amended Complaint alleges facts that NGL transferred the invalid RINs to other obligated parties, the Amended Complaint sufficiently alleges a claim against NGL with respect to Count 8.

### D. Count 1

In Count 1, the government alleges that NGL unlawfully failed to retire RINs that it received with its initial purchase of biodiesel when it designated the biodiesel as a feedstock, rather than a transportation fuel, heating oil or jet fuel. Amended Complaint ¶¶ 72-78. NGL argues that Count 1 fails as a matter of law because the regulation at

issue, § 80.1429(f), contemplates only the end use or designated end use of the fuel in question. *See* NGL Brief at 26-28. According to NGL, because use as a feedstock is an interim use rather than an end use, it was under no obligation to retire RINs when it designated the biodiesel as a feedstock. *See id.*

Section 80.1429(f) provides, in pertinent part: "Any party that uses a renewable fuel in any application that is not transportation fuel, heating oil, or jet fuel, or designates a renewable fuel for use as something other than transportation fuel, heating oil, or jet fuel, must retire any RINs received with that renewable fuel. . . ." 40 C.F.R. § 80.1429(f). The regulation does not distinguish between "end uses" and "interim uses," nor does any other regulation in the renewable fuel program. Therefore, the court assigns "use" its ordinary meaning. *See Jungers*, 702 F.3d at 1071. The "use" of something is "[t]he act of putting something to work, or employing or applying a thing for any (esp. a beneficial or productive) purpose." Use, n., *Oxford English Dictionary Online*, http://www.oed.com /view/Entry/220635?rskey=ob8mPy&result=1#eid (last visited Apr. 24, 2017). This ordinary meaning of "use" suggests no distinction between end uses and interim uses. Instead, it suggests that a party must retire RINs whenever its fuel is "put to work" or designated to be "put to work" for any purpose that is not transportation fuel, heating oil, or jet fuel—no matter the stage of the fuel's lifespan that the use occurs. Under this interpretation, § 80.1429(f) requires RIN retirement whenever a fuel is used for, or designated for, an unapproved purpose at any stage.

Furthermore, even if § 80.1429(f) did support a distinction between an end use and an interim use, the provision contemplates more than just the use of a fuel—it also contemplates the designated use given to the fuel. Thus, under a plain reading of the provision, a party's designation of a fuel for an unapproved purpose requires the party to retire the RINs associated with the fuel, even if the fuel is ultimately used for an approved purpose. Rulemaking documents associated with the EPA's promulgation of the RFS2

regulations lend support to this interpretation. With respect to another provision of § 80.1429, the EPA illustrates that "if a party intends to separate RINs" from a volume of fuel or fuel blend that it intends to transfer, "the party must designate the blend for use as transportation fuel, heating oil, or jet fuel." *See* 75 Fed. Reg. 14670-01, 14726, 2010 WL 1130808 (Mar. 26, 2010). "The party is also required to maintain records of this designation . . . . [and] notify downstream parties that the volume of fuel has been designated for use as transportation fuel, heating oil, or jet fuel, and must be used in that designated form without blending." *Id.* "Parties may separate RINs at the time they comply with the designation and [notification] requirements, and do not need to physically track ultimate fuel use." *Id.* While this illustration does not specifically address § 80.1429(f), it does demonstrate that the EPA sought to tie RIN availability to the designated use of a fuel, even where downstream parties deviate from the designation. Because a fuel's designation purports to bind all downstream parties, whether they function as interim users or end users, it is apparent that § 80.1429(f) requires RIN retirement whenever a fuel is designated for an unapproved purpose at any stage.

NGL argues that this interpretation of § 80.1429(f) conflicts with § 80.1426(c)(6)(ii)(A), which requires a party to assign a renewable fuel's original RINs to any new fuel produced using the renewable fuel as a feedstock. *See* NGL Brief at 26. According to NGL, because parties must assign the original RINs to new fuel produced using the renewable fuel, § 80.1429(f) cannot require retirement of those original RINs. *See id.* In other words, because § 80.1426(c)(6)(ii)(A) contemplates the use of the original RINs after the renewable fuel is used as a feedstock, NGL argues that the provision would be frustrated if § 80.1429(f) prevented the use of those RINs by demanding that they be retired. Of course, the Amended Complaint alleges that NGL participated in the creation of *new* RINs, rather than the assignment of original RINs to new fuel, making NGL's argued scenario entirely hypothetical. Further, as the court discussed above,

§ 80.1426(c)(6)(ii) permits RIN generation for fuels produced with renewable fuel feedstock only if the party successfully petitions the EPA for a D code and the party did not receive RINs when it acquired the feedstock. Thus, an obligated party must interact with the EPA (via the petition process) before it may generate RINs for fuels produced with renewable fuel feedstock. The government states that the EPA uses the petition process to remedy conflicts between § 80.1426(c)(6)(ii) and § 80.1429(f), should they arise. *See* Resistance at 27. As such, even if § 80.1429(f) is deemed ambiguous, because the EPA maintains a mechanism for remedying potential conflicts between provisions, and because the EPA's interpretation of § 80.1429(f) is reasonable,[5] the court finds that the EPA's interpretation is entitled to *Auer* deference.

The Amended Complaint alleges that NGL did not designate the biodiesel it sold to Western Dubuque as a transportation fuel, heating oil or jet fuel, and Western Dubuque did not use the biodiesel as transportation fuel, heating oil or jet fuel. Instead, NGL designated it as a feedstock, and Western Dubuque used it as a feedstock. NGL's failure to designate the biodiesel for an approved purpose, in addition to Western Dubuque's failure to use it for an approved purpose, required NGL to retire the RINs that it received with the biodiesel pursuant to § 80.1429(f). Accordingly, the Amended Complaint sufficiently alleges a claim against NGL with respect to Count 1.

### E. Injunctive Relief

In the Amended Complaint, the government seeks injunctive relief requiring NGL and Western Dubuque to "retire 36,085,389 valid D4 RINs to offset the harm caused by the violations" alleged. Amended Complaint at 23 (Request for Relief).[6] NGL argues that

---

[5] The EPA's interpretation mirrors the court's interpretation. *See* Resistance at 25-26.

[6] The amended consent decree settled the claims against Western Dubuque without requiring Western Dubuque to purchase and retire any RINs. *See generally* Amended

(continued…)

such relief is unavailable to the government because: (1) requiring the purchase and sale of RINs amounts to a penalty subject to certain statutory limitations, rather than an equitable injunction; (2) the retirement of new RINs will not offset or remedy any harm resulting from NGL's actions during the 2011 RVO compliance period; and (3) § 80.1474 (2014) provides that only entities who own, generated, or verified an invalid RIN are responsible for retiring valid RINs to remedy the generation of invalid RINs, and NGL fits none of the three contemplated categories. NGL Brief at 28-31. The government resists each of NGL's arguments and claims that the court may order NGL to retire valid RINs under its inherent equitable powers. Resistance at 28-30.

Initially, the court rejects NGL's argument with respect to § 80.1474 (2014). This regulation, itself, expressly provides that it "does not, in any way, limit the ability of the United States to . . . bring an enforcement action under section 211 of the Clean Air Act, the fuels regulations at 40 CFR part 80, or any other applicable law." 40 C.F.R. § 80.1474(c) (2014). In short, the regulation cited by NGL "does not, in any way, limit" the government's pursuit of the relief in the Amended Complaint. The court shall proceed to consider NGL's remaining arguments challenging the government's requested relief.

The Clean Air Act grants the court injunctive authority "to restrain violations [of the Clean Air Act] and of the regulations prescribed [under the Clean Air Act], to award other appropriate relief, and to compel the furnishing of information and the conduct of tests required by [the EPA]." 42 U.S.C. § 7545(d)(2). Pursuant to this provision, the government's requested relief is cognizable if it restrains a violation of the renewable fuel program regulations or if it is otherwise appropriate relief. NGL argues that retirement of newly purchased RINs will not "restrain" any violations because the violations alleged

---

[6](…continued)
Consent Decree. Therefore, the requested injunctive relief remains with respect to NGL only.

in the Amended Complaint "occurred—and ended—years ago." NGL Brief at 28. The government does not explicitly argue that its requested relief will restrain violations, but instead argues that the relief is authorized under the court's broad equitable powers. *See* Resistance at 28-30. Accordingly, the court will assume that the government's requested relief will not restrain NGL's violations and will consider only whether such relief is otherwise appropriate.

NGL first argues that an order requiring the purchase and retirement of RINs amounts to a penalty, rather than an injunction, and that such a penalty is not authorized under the Clean Air Act. NGL Brief at 29. The government argues that the purchase and retirement of RINs will "remedy, mitigate, and offset harms caused to the public and the environment," such that it amounts to proper equitable relief permitted by § 7545(d)(2). Resistance at 29 (quoting *United States v. Cinergy Corp.*, 582 F. Supp. 2d 1055, 1061 (S.D. Ind. 2008)).

"When a federal statute authorizes injunctive relief, the presumption is that Congress intends the courts to exercise their traditional equitable discretion." *Sharp v. Parents in Comty. Action, Inc.*, 172 F.3d 1034, 1038 (8th Cir. 1999). The presumption can be defeated if "a statute in so many words, or by a necessary and inescapable inference, restrict's the court's jurisdiction in equity." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982). NGL cites several non-binding cases in which courts held that the Clean Air Act rendered the purchase and retirement of various EPA-regulated credits unavailable as a remedy for violations of Clean Air Act programs. *See* NGL Brief at 29 (citing *United States v. EME Homer City Generation, L.P.*, 727 F.3d 274, 295-96 (3d Cir. 2013) (rejecting requested injunctive relief requiring a defendant "to purchase and retire emissions credits to offset pollution elsewhere in the nation" as remedy for violation of the Prevention of Significant Deterioration of air quality ("PSD") program, where the emission credits corresponded with a separate Clean Air Act program); *United States v.*

*Midwest Generation, LLC*, 781 F. Supp. 2d 677, 685 (N.D. Ill. 2011) (rejecting "an injunction requiring [a defendant] to purchase and retire sulfur-dioxide allowances to mitigate past illegal sulfur-dioxide emissions" as remedy for violation of the PSD program, because such injunction "would be a penalty")). For its part, the government cites several other cases that found such remedies to be available under the Clean Air Act. *See* Resistance at 29-30 (citing *United States v. Ameren, Mo.*, No. 4:11-CV-77-RWS, 2016 WL 468557, at *3 (E.D. Mo. Feb. 8, 2016) (determining that "the surrender of emissions allowances" was a permissible equitable remedy for violation of the PSD program, because such relief "could restore the status quo by reducing the total amount of pollution in the affected area"); *United States v. Westvaco Corp.*, Civ. No. MJG-00-2602, 2015 WL 10323214, at *12 (D. Md. Feb. 26, 2015) (determining that the purchase and retirement of emissions credits is a permissible equitable remedy for a violation of the PSD program, in part because it "[a]void[s] providing punishment rather than remediation")).

Met with this split in authority, the court notes that each of the cases cited by the parties involved violations of the PSD program, rather than the renewable fuel program. The Third Circuit found the purchase and retirement of emissions credits to be a penalty in part because Congress did not intend for "an emissions-credit marketplace for the PSD program," and the court refused to "import it under the guise of injunctive relief." *EME Homer City*, 727 F.3d at 296; *see also Ameren*, 2016 WL 468557, at *2-*3 (observing the lack of a credit marketplace in the PSD program). With respect to the renewable fuel program, Congress explicitly created a credit program. *See* 42 U.S.C. § 7545(o)(5). As such, the relief sought by the government requires no judicial contravention of Congress's intent for the renewable fuel program. Additionally, the Third Circuit expressed concern that, because the government had brought its claims outside of the statute of limitations on civil fines and penalties, a remedy requiring the purchase and retirement of emissions credits "would amount to little more than an end-run around the . . . statute of

limitations." *EME Homer City*, 727 F.3d at 296. To the extent such concerns may apply in some cases arising under the renewable fuel program, they do not exist in this particular case because the government brought its claims within the five-year statute of limitations. *Compare* 28 U.S.C. § 2462 (imposing a five-year statute of limitations on any "action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise"), *and* Amended Complaint ¶¶ 73, 114, 120 (alleging violations extending through approximately December of 2011), *with* Complaint (docket no. 1) (original complaint filed on October 4, 2016). Lastly, both the Third Circuit and the district court in the Northern District of Illinois expressed concern that the purchase and retirement of emissions credits resembles the "awarding [of] monetary relief," making it a penalty. *EME Homer City*, 727 F.3d at 295-96; *Midwest Generation*, 781 F. Supp. 2d at 685. However, the mere fact that an injunction requires a party to spend money to secure compliance does not transform the injunction into a penalty. *United States v. Apex Oil Co., Inc.*, 579 F.3d 734, 736 (7th Cir. 2009) ("That equitable remedies are always orders to act or not to act, rather than to pay, is a myth; equity often orders payment."); *cf. Dollar v. Smithway Motor Xpress, Inc.*, 710 F.3d 798, 809 (8th Cir. 2013) (observing, in employment context, that "[f]ront pay is an equitable remedy courts may award when it is determined reinstatement is no longer feasible"). Unlike the cases cited by NGL (as well as those cited by the government), the purchase and retirement of RINs does not look to separate Clean Air Act schemes to remedy an unrelated violation of EPA regulations. Instead, the remedy is tailored to the unlawful generation of RINs, which gives rise to the violations at issue. Because the cases cited by the parties are distinguishable and unpersuasive in the context of the renewable fuel program, the court finds that the purchase and retirement of RINs is appropriate equitable relief under § 7545(d)(2).

NGL argues that the purchase and retirement of new RINs will not offset the harm caused by its alleged misconduct in 2011, because the retirement of the new RINs will

implicate a different year's RVO compliance period. NGL Brief at 29. NGL's argument fails due to its misunderstanding of the harm at issue. The harm caused by the unlawful generation of RINs is not the inaccurate reporting of RVO compliance, it is the environmental harm that resulted from the introduction of less renewable fuel into commerce, which required additional fossil fuel to compensate for the deficit. As such, tying the retirement of RINs to a particular compliance period is unnecessary. By retiring the same number of RINs today that NGL unlawfully generated in 2011, NGL would effectively introduce more renewable fuel into commerce, creating a surplus resulting in the introduction of less fossil fuel. In this manner, the purchase and retirement of RINs would offset the harm caused by NGL's violations in 2011.

Accordingly, because the government's proposed remedy is equitable relief tailored to offset the harm caused by NGL's violations, the court finds such relief to be permissible under 42 U.S.C. § 7545(d)(2) and the court's inherent equitable powers.

## VI. CONCLUSION

In light of the foregoing, the Motion (docket no. 25) is **DENIED**. All counts against NGL remain and shall proceed to trial.

**IT IS SO ORDERED.**

**DATED** this 24th day of May, 2017.

LINDA R. READE, JUDGE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA