**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

UNITED STATES OF AMERICA,

          Plaintiff,

vs.

NGL CRUDE LOGISTICS, LLC,

          Defendant.

No. 16-CV-1038-LRR

**SEALED ORDER**

_____

*TABLE OF CONTENTS*

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.    RELEVANT PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . 2

III.   SUBJECT MATTER JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . 4

IV.   SUMMARY JUDGMENT STANDARD . . . . . . . . . . . . . . . . . . . . . . . . 4

V.    RELEVANT FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . 6

     A.     Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
     B.     Renewable Fuel Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
     C.     2011 Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
     D.     Formation of the Biodiesel Reprocessing Arrangement. . . . . . . . . . 10

VI.   ANALYSIS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

     A.     Scope of Regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
     B.     Regulation Interpretation . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
     C.     Count 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
           1.     End use of the biodiesel . . . . . . . . . . . . . . . . . . . . . . . 14
           2.     Potential conflict between § 80.1429(f) and
                § 80.1426(c)(6)(ii)(A) . . . . . . . . . . . . . . . . . . . . . . . . 17
           3.     Designation of the biodiesel as a feedstock . . . . . . . . . . . . 19
           4.     Number of RINs . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
           5.     Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
     D.     Count 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
           1.     Amended Consent Decree . . . . . . . . . . . . . . . . . . . . . . 21
           2.     Western Dubuque's alleged violations . . . . . . . . . . . . . . . 24

|  |  | a. | *Generation of RINs* . . . . . . . . . . . . . . . . . . . . . . . | 24 |
|  |  | b. | *Introduction of RINs into commerce* . . . . . . . . . . . . . | 27 |
|  |  | c. | *Transfer of RINs* . . . . . . . . . . . . . . . . . . . . . . . | 29 |
|  | 3. | | *Cause of violations* . . . . . . . . . . . . . . . . . . . . . . . . . | 30 |
|  | 4. | | *Statute of limitations* . . . . . . . . . . . . . . . . . . . . . . . | 32 |
|  | 5. | | *Summary* . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 33 |
| E. | *Count 8* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | 34 |
| F. | *Fair Notice Doctrine* . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | 35 |
|  | 1. | | *Plain language of the regulations* . . . . . . . . . . . . . . . . | 35 |
|  | 2. | | *Actual notice* . . . . . . . . . . . . . . . . . . . . . . . . . . | 37 |
|  | 3. | | *Declaration of James Pardo* . . . . . . . . . . . . . . . . . . . | 41 |
| G. | *Selective prosecution* . . . . . . . . . . . . . . . . . . . . . . . . . . | | | 41 |
| VII. | **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | 42 |

## I. INTRODUCTION

The matters before the court are Plaintiff United States of America's ("the government") Motion for Partial Summary Judgment ("First Government Motion") (docket no. 79), the government's Second Motion for Partial Summary Judgment ("Second Government Motion") (docket no. 137) and Defendant NGL Crude Logistics, LLC's ("NGL") Motion for Summary Judgment ("NGL Motion") (docket no. 138).

## II. RELEVANT PROCEDURAL HISTORY

On January 9, 2017, the government filed an Amended Complaint (docket no. 21) against Defendants NGL and Western Dubuque Biodiesel, LLC ("Western Dubuque"). The Amended Complaint alleged violations of the Clean Air Act and related regulations, and sought civil penalties and injunctive relief. *See generally* Amended Complaint. Specifically, the government alleged that: (1) NGL failed to retire Renewable Identification Numbers ("RINs") associated with a quantity of biodiesel, in violation of 40 C.F.R. § 80.1429(f) (2011); (2) Western Dubuque generated RINs using a non-qualifying feedstock, in violation of 40 C.F.R. §§ 80.1426(c)(6)(i), 80.1460(a); (3) Western Dubuque generated RINs using a non-qualifying process, in violation of 40 C.F.R. §§ 80.1426(c)(6)(i), 80.1460(a); (4) Western Dubuque used a feedstock and/or process that

2

was not registered with the Environmental Protection Agency ("EPA"), in violation of 40 C.F.R. § 80.1460(b)(5); (5) Western Dubuque improperly identified RINs in the EPA's reporting system, in violation of 40 C.F.R. §§ 80.1452(b)(2), (4), 80.1460(f); (6) Western Dubuque created and transferred invalid RINs, in violation of 40 C.F.R. § 80.1460(b)(2); (7) NGL caused Western Dubuque to commit prohibited acts, in violation of 40 C.F.R. § 80.1460(e); and (8) NGL transferred invalid RINs, in violation of 40 C.F.R. § 80.1460(b)(2).[1] *See id.* ¶¶ 72-125.

On January 23, 2017, NGL filed a Motion to Dismiss (docket no. 23). In the Motion to Dismiss, NGL argued that the overarching conduct alleged by the government—that NGL and Western Dubuque generated new RINs from biodiesel feedstock that had previously generated RINs—was lawful at the time. *See* Brief in Support of Motion to Dismiss (docket no. 23-4) at 18-19. Upon review and interpretation of the relevant statutory and regulatory provisions, the court denied the Motion to Dismiss. *See generally* May 24, 2017 Order (docket no. 52).

On April 11, 2017, the court approved an Amended Consent Decree (docket no. 48), which resulted in the settlement of the government's claims against Western Dubuque. *See* April 11, 2017 Order (docket no. 47) at 13-14. The Amended Consent Decree was a "final judgment of the [c]ourt as to the [government] and [Western Dubuque]" and "resolve[d] the civil claims of the [government] against [Western Dubuque] for the alleged violations in the Complaint." Amended Consent Decree at 21, 28. In the Amended Consent Decree, Western Dubuque did "not admit to any violations and/or any liability to the [government] arising out of the transactions or occurrences alleged in the [Amended] Complaint." *Id.* at 4. On September 28, 2017, the government filed a Second Amended

---

[1] Because the Amended Complaint alleges conduct occurring in 2011, all citations to renewable fuel program regulations will refer to the regulations as they existed in 2011, except where explicitly noted.

Complaint (docket no. 72), which eliminated some allegations against NGL. *Compare* Amended Complaint *with* Second Amended Complaint. The claims remaining against NGL are Counts 1, 7 and 8.

On October 17, 2017, the government filed the First Government Motion. On March 28, 2018, the government filed the Second Government Motion. On that same day, NGL filed the NGL Motion and a Resistance to the First Government Motion (docket no. 140). On April 11, 2018, the government filed a Reply in Support of the First Government Motion (docket no. 155). On April 16, 2018, NGL filed a Sur-Reply in Support of its Resistance to the First Government Motion (docket no. 160). On April 23, 2018, the government filed a Resistance to the NGL Motion (docket no. 166). On that same day, NGL filed a Resistance to the Second Government Motion (docket no. 172). On May 4, 2018, NGL filed a Reply in Support of the NGL Motion (docket no. 182). On May 7, 2018, the government filed a Reply in Support of the Second Government Motion (docket no. 187).

The parties request oral argument, but the court finds that oral argument is unnecessary. The matter is fully submitted and ready for decision.

### III. SUBJECT MATTER JURISDICTION

The court has federal-question jurisdiction over the government's claims, which arise under the Clean Air Act. *See* 28 U.S.C. §§ 1331, 1345 and 1355.

### IV. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is proper 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show'" an absence of a genuine dispute as to a material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting Fed. R. Civ. P. 56(c)(2)). "A dispute is genuine if the evidence is such

4

that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)). "The movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson*, 643 F.3d at 1042 (alterations in original) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the movant has done so, "the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex Corp.*, 477 U.S. at 324).

On a motion for summary judgment, the court must view the facts "in the light most favorable to the nonmoving party." *Id.* (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial," and summary judgment is appropriate. *Ricci*, 557 U.S. at 586 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "The nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts' . . . ." *Torgerson*, 643 F.3d at 1042 (quoting *Matsushita*, 475 U.S. at 586). Instead, "[t]o survive a motion for summary judgment, the nonmoving party must 'substantiate his allegations with sufficient probative evidence [that] would permit a finding in [his] favor based on more than mere speculation, conjecture, or fantasy.'" *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 801 (8th Cir. 2011) (second and third alterations in original) (quoting *Putman v. Unity Health Sys.*, 348 F.3d 732, 733-34 (8th Cir. 2003)). Mere "self-serving allegations and denials are insufficient to create a genuine issue of material fact." *Anuforo v. Comm'r of Internal Revenue*, 614 F.3d 799, 807 (8th Cir. 2010).

5

## V. RELEVANT FACTUAL BACKGROUND

Viewing the evidence in the light most favorable to the nonmoving party, and affording it all reasonable inferences, the uncontested facts are as follows.

### A. Parties

The government brings the instant action on behalf of the EPA.

NGL is a "midstream energy provider that transports crude oil, and markets and supplies refined product, natural gas liquids, and other products." Second Amended Complaint ¶ 7; Answer (docket no. 57) ¶ 7. During the times relevant to the events of this case, NGL was known as Gavilon, LLC. *See* Statement of Undisputed Material Facts ("SUMF") in Support of the First Government Motion ("First Government Motion SUMF") (docket no. 79-2) ¶¶ 1-2; Response to First Government Motion SUMF (docket no. 140-1) ¶¶ 1-2.

Western Dubuque owns and operates a biodiesel plant in Farley, Iowa. Second Amended Complaint ¶ 9.

### B. Renewable Fuel Program

In the Energy Policy Act of 2005, Congress amended the Clean Air Act to create a renewable fuel program to promote the availability and use of renewable fuel in the United States. *See* Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 (codified at 42 U.S.C. § 7545(o)). The Energy Policy Act required the EPA to promulgate renewable fuel standards, *see* 40 C.F.R. §§ 80.1100-1167, and a "credit trading program" to implement the renewable fuel program, *see* Energy Policy Act, 119 Stat. 594 (codified at 42 U.S.C. § 7545(o)(5)). In the Energy Independence and Security Act of 2007, Congress amended the Clean Air Act to refine the operation of the renewable fuel program. *See* Energy Indep. & Sec. Act of 2007, Pub. L. No. 110-140, 121 Stat. 1492 (codified at 42 U.S.C. § 7545(o)(2)). This resulted in the EPA promulgating additional renewable fuel standards (the "RFS2 regulatons"). *See* 40 C.F.R. §§ 80.1400-1474.

6

The renewable fuel program requires gasoline and diesel producers and importers (called "obligated parties") to meet Renewable Volume Obligations ("RVOs"). *See* 40 C.F.R. § 80.1406. Under the RVOs, a percentage of all fuel that an obligated party produces or imports must be a renewable fuel. *See id.* § 80.1407. RINs are assigned by volume to renewable fuel that is produced in or imported to the United States. Obligated parties satisfy their RVOs by "retiring" a sufficient quantity of RINs, demonstrating that they have either produced or traded in the requisite quantities of renewable fuel. *Id.* § 80.1427.

Numerous regulations govern the renewable fuel program and the assignment of RINs. During the relevant time period, various regulations: (1) identified the substances and processes that must be used to produce renewable fuels capable of generating RINs, *id.* § 80.1426 Table 1; (2) permitted the generation of RINs for renewable fuel that qualified for a D code under existing regulations or was approved for a D code after petition to the EPA, *id.* § 80.1426(a)(1); (3) prohibited the generation of RINs for any fuel that did not qualify for a D code under the two avenues provided, *id.* § 80.1426(c)(6)(i); (4) prohibited the generation of RINs for any fuel that is not designated or intended for use as transportation fuel, heating oil or jet fuel, *id.* § 80.1426(c)(1); and (5) prohibited the production or importation of renewable fuels without complying with the RIN-generation scheme, *id.* § 80.1460(a). A "D code" represents the category to which a renewable fuel belongs—for example, the D code for biodiesel is D4. *See id.* § 80.1426 Table 1. For a renewable fuel to qualify for a particular D code, it must be produced using certain "feedstock" substances and certain production processes. *See id.*

Renewable fuel producers are required to register with the EPA and must submit certain information. For example, producers must inform the EPA of the production processes and feedstocks that they are capable of utilizing at their facility. *Id.* §§ 80.1450(b)(1)(i)-(ii). Likewise, producers must report to the EPA regarding each

batch of renewable fuel produced at their facility that generates RINs. Such reports must include the producer's name and EPA registration number, the facility's EPA registration number, the volume and category of fuel produced, the quantity of RINs generated, the D code that belongs to the fuel, the type and quantity of feedstock and the production process used to produce the fuel. *Id.* § 80.1452(b).

The renewable fuel program also regulates the transfer of renewable fuel and RINs. Obligated parties may transfer RINs while attached to the renewable fuel that generated them or they may separate RINs from a batch of renewable fuel and transfer the separated RINs by themselves. *Id.* §§ 80.1428(a)(3), (b)(3). Transfer of RINs—whether separated or attached to renewable fuel—must be reported to the EPA. Such reports must contain specific information regarding the obligated parties involved in the transfer and the nature and quantity of the RINs. *Id.* § 80.1452(c). Additionally, a transferor of RINs must provide a product transfer document to the transferee containing information similar to that provided to the EPA. *Id.* § 80.1453(a). Any RIN generated in noncompliance with the regulations governing the renewable fuel program is deemed invalid and cannot be transferred. *Id.* §§ 80.1431(a), 80.1460(b). An obligated party that uses or designates a renewable fuel for a purpose other than transportation fuel, heating oil or jet fuel must retire all RINs associated with the renewable fuel and report it to the EPA. *Id.* § 80.1429(f).

### C. 2011 Transactions

In 2011, NGL purchased approximately 24 million gallons of biodiesel from third parties, as well as 35,724,000 D4 RINs assigned to that biodiesel. *See* First Government Motion SUMF ¶¶ 3, 6, 7, 10; Response to First Government Motion SUMF ¶¶ 3, 6, 10. NGL separated the 35,724,000 RINs associated with the biodiesel.[2] *See* First Government

---

[2] The court only discusses RINs associated with the biodiesel NGL purchased and
(continued…)

Motion SUMF ¶¶ 6, 10; Response to First Government Motion SUMF ¶¶ 6, 10.  NGL did not retire these RINs after separating them from the biodiesel; it sold them to other obligated parties.  *See* First Government Motion SUMF ¶¶ 6, 11; Response to First Government Motion SUMF ¶ 6.

After separating and selling the associated RINs, NGL sold the approximately 24 million gallons of biodiesel (without RINs) to Western Dubuque.  *See* First Government Motion SUMF ¶ 7.  The biodiesel that NGL sold to Western Dubuque was "methyl ester" and was a "renewable fuel" as defined in 40 C.F.R. § 80.1401.  *See id.* ¶¶ 4, 12; Response to First Government Motion SUMF ¶ 4.  NGL designated the biodiesel as a "feedstock" and provided it to Western Dubuque to be used as a feedstock.  *See* First Government Motion SUMF ¶¶ 8, 9; Second Government Motion Appendix (docket no. 137-3) at 13-21 (agreements regarding the biodiesel reprocessing arrangement stating that NGL would provide "methyl ester" for use as a feedstock), 55 (NGL's November 13, 2014 Supplemental Response to the EPA's July 15, 2014 Clean Air Act Information Request stating that NGL "supplied feedstock to Western Dubuque" and "purchased biodiesel from" Western Dubuque that had been "produced using the feedstock supplied by" NGL).

Western Dubuque then used the purported feedstock to produce approximately 24 million gallons of biodiesel, generating approximately 36 million D4 RINs.  *See* First Government Motion SUMF ¶¶ 14-16; Response to First Government Motion SUMF ¶ 14. In 2011, Western Dubuque was registered to generate biomass-based diesel D4 RINs and

_____

[2](…continued)
subsequently sold to Western Dubuque in 2011.  The court makes no findings about biodiesel NGL purchased from third parties unrelated to the biodiesel reprocessing arrangement  between NGL and Western Dubuque.  *See* Response to First Government Motion SUMF ¶ 6 (noting that NGL only admits that it separated and sold RINs from biodiesel subsequently sold to Western Dubuque).

reported to the EPA that the biodiesel it produced derived from "soybean oil, waste oils/fats/greases, and oil from annual cover crops," and that it used a production process called transesterification. *See* Second Government Motion SUMF ¶ 21; Supplemental SUMF in Support of First Government Motion (docket no. 155-7) ¶¶ 34, 36. Western Dubuque did not file a petition with the EPA under 40 C.F.R. § 80.1416 for the generation of RINs using biodiesel, or methyl ester, as a feedstock. *See* First Government Motion SUMF ¶ 19; Response to First Government Motion SUMF ¶ 19.

Western Dubuque sold the biodiesel and associated RINs back to NGL. *See* First Government Motion SUMF ¶ 16. NGL proceeded to separate the RINs and sell them to other obligated parties. *Id.* ¶ 17. In total, NGL purchased 36,085,389 D4 RINs from Western Dubuque and subsequently transferred those RINs to other obligated parties. *Id.* ¶ 18.

### D. Formation of the Biodiesel Reprocessing Arrangement

The 2011 transactions occurred pursuant to an agreement between the parties (the "biodiesel reprocessing arrangement"). NGL initially formulated the plan for the biodiesel reprocessing arrangement and recruited Western Dubuque. *See* Second Government Motion SUMF (docket no. 137-2) ¶ 23; Second Government Motion Appendix at 188, 195-96 (providing testimony of NGL employees stating that NGL formulated the initial plan to produce two sets of RINs and presented it to Western Dubuque); Response to Second Government Motion SUMF (docket no. 172-1) ¶ 23 (admitting that NGL "proposed" the biodiesel reprocessing arrangement to Western Dubuque). The first meeting between the parties occurred in December 2010, when Grant Vanglider, an NGL employee, met with representatives from Western Dubuque to discuss the potential biodiesel reprocessing arrangement. *See* SUMF in Support of Resistance to Second Government Motion (docket no. 172-2) ¶ 7.

NGL states that both parties intended that Western Dubuque's reprocessed biodiesel

10

would be of higher quality and have lower monoglyceride levels than the biodiesel NGL sold to Western Dubuque for use as a feedstock. *See* NGL Motion SUMF (docket no. 138-2) ¶¶ 16, 19. Pursuant to the biodiesel reprocessing arrangement, Western Dubuque had a right to reject, under certain limited circumstances, the methyl esters provided by NGL. *See* SUMF in Support of Resistance to First Government Motion (docket no. 140-2) ¶ 31. Western Dubuque did reject some shipments of biodiesel, or methyl ester, from NGL. *Id.* ¶ 32.

NGL began selling biodiesel, or methyl ester, to Western Dubuque in January 2011. *See* SUMF in Support of Resistance to Second Government Motion ¶ 7. Western Dubuque began generating RINs under the agreement on January 26, 2011. *See id.* ¶¶ 24-25. NGL and Western Dubuque ended the biodiesel reprocessing arrangement at the end of 2011. *See* SUMF in Support of Resistance to First Government Motion ¶ 8.

## VI. ANALYSIS

In the First Government Motion, the government seeks summary judgment on Counts 1 and 8. *See generally* First Government Motion. In the Second Government Motion, the government seeks summary judgment on Count 7 and on NGL's fair notice and selective prosecution defenses. *See generally* Second Government Motion. NGL resists summary judgment on all counts. In the NGL Motion, NGL seeks summary judgment on Counts 7 and 8 on the grounds that the Amended Consent Decree precludes litigation of essential elements of these counts. NGL also seeks summary judgment on Count 1 on the grounds that the undisputed facts establish that NGL did not designate a renewable fuel for use as something other than transportation fuel. *See generally* NGL Motion. The court will address each count in turn.

### A. Scope of Regulations

In 2011, when NGL and Western Dubuque allegedly engaged in the conduct at issue, EPA regulations provided as follows:

11

(a) *General requirements.*—(1) To the extent permitted under . . . this section, producers and importers of renewable fuel must generate RINs to represent that fuel if the fuel:

(i) Qualifies for a D code . . . , or EPA has approved a petition for use of a D code . . .; and

(ii) Is demonstrated to be produced from renewable biomass pursuant to the reporting requirements . . . and the recordkeeping requirements of [the renewable fuel program].

. . . .

[(c)](6) A party is prohibited from generating RINs for a volume of fuel that it produces if:

(i) The fuel does not meet the requirements of paragraph (a)(1) of this section; or

(ii) The fuel has been produced from a chemical conversion process that uses another renewable fuel as a feedstock, the renewable fuel used as a feedstock was produced by another party, and RINs were received with the renewable fuel.

40 C.F.R. §§ 80.1426(a)(1), (c)(6).

## B. Regulation Interpretation

An agency's interpretation of its own regulation is generally controlling. *See Auer v. Robbins*, 519 U.S. 452, 461 (1997); *accord Northshore Min. Co. v. Sec'y of Labor*, 709 F.3d 706, 709 (8th Cir. 2013); *Fast v. Applebee's Int'l, Inc.*, 638 F.3d 872, 878 (8th Cir. 2011). However, this so-called *Auer* deference does not apply if the agency's interpretation: (1) is "plainly erroneous or inconsistent with the regulation"; (2) "does not reflect the agency's fair and considered judgment on the matter in question"—such as when it "conflicts with a prior interpretation" or appears to be a mere "convenient litigating position" or "*post hoc* rationalization"; or (3) results in "unfair surprise." *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155-56 (2012) (internal citations and quotation marks omitted). *Auer* deference applies "only when the language of the regulation is ambiguous." *Northshore*, 709 F.3d at 709 (quoting *Fast*, 638 F.3d at 878). Ambiguity of a regulation is a matter of statutory—or regulatory—construction. *See United States v. White Plume*, 447 F.3d 1067, 1074 (8th Cir. 2006) ("Under statutory

12

interpretation, a statute is ambiguous if it is capable of being understood in two or more possible senses or ways." (quotation omitted)); *see also Northshore*, 709 F.3d at 709 (applying rules of statutory construction to the interpretation of a regulation). Finally, when looking to the plain language of the regulation, the court keeps in mind "that the words of a [regulation] must be read in their context and with a view to their place in the overall [regulatory] scheme." *Northshore*, 709 F.3d at 710 (quoting *Davis v. Mich. Dep't of the Treasury*, 489 U.S. 803, 809 (1989)).

## *C. Count 1*

In Count 1 of the Second Amended Complaint, the government alleges that, after designating its quantity of biodiesel as a feedstock, NGL failed to retire the RINs that it had received with the biodiesel, as required under 40 C.F.R. § 80.1429(f). Second Amended Complaint ¶¶ 73-74. Section 80.1429(f) provides, in pertinent part: "Any party that uses a renewable fuel in any application that is not transportation fuel, heating oil, or jet fuel, or designates a renewable fuel for use as something other than transportation fuel, heating oil, or jet fuel, must retire any RINs received with that renewable fuel . . . ." 40 C.F.R. § 80.1429(f). Thus, to prevail on Count 1, the government must prove that NGL: (1) used or "designate[d] a renewable fuel for use as something other than transportation fuel, heating oil, or jet fuel" and (2) failed to "retire any RINs received with that renewable fuel." *Id.*

It is undisputed that NGL supplied biodiesel to Western Dubuque to be used as a feedstock to produce biodiesel. *See, e.g.*, Second Government Motion Appendix at 13-21 (agreements regarding the biodiesel reprocessing arrangement stating that NGL would provide "methyl ester" for use as a feedstock), 55 (NGL's November 13, 2014 Supplemental Response to the EPA's July 15, 2014 Clean Air Act Information Request stating that NGL "supplied feedstock to Western Dubuque" and "purchased biodiesel from" Western Dubuque that had been "produced using the feedstock supplied by" NGL).

Western Dubuque's use of the biodiesel as a feedstock was central to the biodiesel reprocessing arrangement. *See id.*

Based on these facts, the government argues that it is entitled to summary judgment on NGL's liability for Count 1 because "NGL did not retire RINs it received with the biodiesel that it subsequently designated and sold to Western Dubuque as 'feedstock.'"[3] Brief in Support of First Government Motion (docket no. 79-1) at 9. NGL contends that the government's argument is incorrect because: (1) NGL arranged for the biodiesel to ultimately be used as a transportation fuel; (2) the government's interpretation of § 80.1429(f) conflicts with § 80.1426(c)(6)(ii)(A); (3) there is a factual dispute over who designated the biodiesel as a feedstock; and (4) the number of RINs that allegedly should have been retired is in dispute.[4] *See* Resistance to First Government Motion at 14-21; *see also* Brief in Support of NGL Motion (docket no. 138-1) at 14-18 (seeking summary judgment on the first two of these grounds).

### 1. End use of the biodiesel

NGL argues that it cannot be liable under § 80.1429(f) because it arranged for the biodiesel sold to Western Dubuque to be used as a transportation fuel. NGL states that "[a] fundamental purpose of the biodiesel reprocessing arrangement was to create a better transportation fuel" and, "[t]hus, the reprocessing arrangement ensured that the original biodiesel became a more reliable transportation fuel product." Resistance to First Government Motion at 14. The government contends that NGL's argument fails because

---

[3] The government does not seek summary judgment on "the amount of civil penalty to be imposed" or the "appropriate injunctive relief" if it is successful on the liability issue. Brief in Support of First Government Motion at 4 n.1. Rather, the government states that "[t]hese issues will be resolved through subsequent motions or at trial." *Id.*

[4] Throughout the briefings, NGL also argues that, even if it violated the regulations, it is entitled to a fair notice defense on Counts 1, 7 and 8. The court shall consider this defense below.

14

NGL's designation of the fuel for an unapproved use—i.e., use as a feedstock—required NGL to retire the RINs associated with the fuel, even if Western Dubuque ultimately processed the feedstock into a transportation fuel. *See* Reply in Support of First Government Motion at 4.

The court previously addressed and rejected NGL's argument that § 80.1429(f) only contemplates the end use or designated end use of the fuel. In ruling on NGL's Motion to Dismiss, the court found that the definition of "use" in § 80.1429(f):

> suggests no distinction between end uses and interim uses. Instead, it suggests that a party must retire RINs whenever its fuel is "put to work" or designated to be "put to work" for any purpose that is not transportation fuel, heating oil, or jet fuel—no matter the stage of the fuel's lifespan that the use occurs. Under this interpretation, § 80.1429(f) requires RIN retirement whenever a fuel is used for, or designated for, an unapproved purpose at any stage.

> Furthermore, even if § 80.1429(f) did support a distinction between an end use and an interim use, the provision contemplates more than just the use of a fuel—it also contemplates the designated use given to the fuel. Thus, under a plain reading of the provision, a party's designation of a fuel for an unapproved purpose requires the party to retire the RINs associated with the fuel, even if the fuel is ultimately used for an approved purpose.

May 24, 2017 Order at 18; *see also id.* at 17-20 (discussing the court's rational for this interpretation).

Thus, NGL's argument fails because § 80.1429(f) contemplates more than just the end use of a fuel—it also contemplates the designated use given to the fuel at any stage of the fuel's lifespan. NGL provides no convincing rationale, and the court finds none, to abandon its prior interpretation of the regulation. *See* May 24, 2017 Order at 17-20. It is undisputed that NGL did not designate the biodiesel it sold to Western Dubuque as a transportation fuel, heating oil or jet fuel. It is also undisputed that Western Dubuque did

15

not use the biodiesel as transportation fuel, heating oil or jet fuel. Instead, NGL designated it as a feedstock, and Western Dubuque used it as a feedstock. When it designated the biodiesel for use as a feedstock, instead of a transportation fuel or other approved use, NGL was required by § 80.1429(f) to retire the RINs received with the biodiesel.

NGL argues that the EPA's Rule 30(b)(6) designee on § 80.1416 petitions, Sharyn Lie, testified that NGL was not required to retire RINs in this situation. *See* Resistance to First Government Motion at 15. This argument is unpersuasive. During her deposition, NGL asked Lie about using ethanol as a feedstock. *See* Appendix to Resistance to First Government Motion (docket no. 140-4) at 46. When asked about the use of ethanol as a feedstock, Lie responded that "[t]he finished fuel would still be transportation fuel." *Id.* Lie further stated that "ethanol [that] is used as, essentially ends up in the transportation fuel, . . . would be consistent with the part of the regulations associated with, with ensuring that this was used for transportation fuel purposes." *Id.* Lie's testimony did not discuss NGL's legal obligations under § 80.1429(f) when it designated a renewable fuel that had RINs attached to it as a feedstock. Rather, Lie's testimony, viewed in its totality, was that when ethanol is used as a feedstock—which, as discussed below, is only proper if a § 80.1416 petition was granted—the finished fuel is a transportation fuel within the meaning of the regulations. *See id.* As this court has previously concluded, "a party's designation of a fuel for an unapproved purpose requires the party to retire the RINs associated with the fuel, even if the fuel is ultimately used for an approved purpose." May 24, 2017 Order at 18.

Further, even if Lie testified that NGL had no legal obligation to retire the RINs, such testimony would not be binding on the EPA. Lie was the EPA's Rule 30(b)(6) designee on § 80.1416 petitions. *See* Supplemental SUMF in Support of First Government Motion ¶ 23. Neither NGL nor Western Dubuque ever submitted a § 80.1416 petition.

16

Questions regarding the EPA's interpretation of § 80.1429(f) were outside the purview of Lie's designated testimony. *See id.* (listing the topics on which Lie was a designated witness). Indeed, when asked about this topic, Lie specifically noted that her "area is not to interpret all of the regulations," that "there are a lot of definitions in the RFS program" and that this issue "would be governed by other parts of the regulations, not specific to the petition [process]." *See* Appendix to Resistance to First Government Motion at 46. While NGL had the right to ask Lie questions outside the scope of her designated topics, *see Am. Gen. Life Ins. Co. v. Billard*, 2010 WL 4367052, at *4 (N.D. Iowa Oct. 28, 2010) ("[T]he questioning of a Rule 30(b)(6) deponent is not limited to subjects identified in the . . . notice."), Lie's answers were not binding on the EPA, *see, e.g.*, *Detoy v. City & Cty. of S.F.*, 196 F.R.D. 362, 367 (N.D. Cal. 2010) (noting that "answers to questions beyond the scope of the Rule 30(b)(6) designation are not intended as the answers of the designating party and do not bind the designating party").

Accordingly, NGL's designation of the biodiesel for an unapproved purpose, in addition to Western Dubuque's failure to use it for an approved purpose, required NGL to retire the RINs that it received with the biodiesel pursuant to § 80.1429(f).

### 2. *Potential conflict between § 80.1429(f) and § 80.1426(c)(6)(ii)(A)*

NGL argues that interpreting § 80.1429(f) to require RIN retirement when a renewable fuel is used as a feedstock improperly conflicts with § 80.1426(c)(6)(ii)(A), which requires a party using a renewable fuel as feedstock to assign any RINs recieved with the feedstock to the new fuel. *See* Resistance to First Government Motion at 16. NGL contends that § 80.1429(f) only requires RIN retirement "when someone arranges for a renewable fuel to be converted into something that can never be used as transportation fuel." *Id.* (emphasis omitted). The government argues that the court previously determined this issue when ruling on the Motion to Dismiss. *See* Reply in Support of First Government Motion at 6.

17

The court addressed NGL's argument in detail when ruling on the Motion to Dismiss. In short, the court noted that "NGL participated in the creation of *new* RINs, rather than the assignment of original RINs to new fuel, making NGL's argued scenario entirely hypothetical." *See* May 24, 2017 Order at 19. The court concluded, however, that "§ 80.1426(c)(6)(ii) permits RIN generation for fuels produced with renewable fuel feedstock only if the party successfully petitions the EPA for a D code and the party did not receive RINs when it acquired the feedstock." *Id.* at 20; *see also id.* at 12-13. "Thus, an obligated party must interact with the EPA (via the petition process) before it may generate RINs for fuels produced with renewable fuel feedstock" allowing the EPA to use "the petition process to remedy conflicts between § 80.1426(c)(6)(ii) and § 80.1429(f), should they arise." *Id.* The court rejected NGL's argument, concluding that "even if § 80.1429(f) is deemed ambiguous, because the EPA maintains a mechanism for remedying potential conflicts between provisions, and because the EPA's interpretation of § 80.1429(f) is reasonable, . . . the EPA's interpretation is entitled to *Auer* deference." *Id.*

NGL provides no persuasive argument that the court should abandon this interpretation of the regulation.[5] Accordingly, NGL's failure to designate the biodiesel for

---

[5] NGL argues that the EPA has not filed suit against other entities under § 1429(f) and failed to investigate a 2011 tip that Unity Fuel was selling biodiesel as a feedstock. *See* Resistance to First Government Motion at 18. NGL cites no case law, and the court finds none, suggesting that the EPA must investigate or bring suit against every alleged violator of a regulation. Further, it is undisputed that the owner of Unity Fuels was sentenced to five years in prison for "his role in a scheme that generated over $7 million in fradulent tax credits and [RIN] credits connected to the purported production of biodiesel fuel," as well as subsequent obstruction of justice charges. *See* Press Release 17-373, Department of Justice, New Jersey Feedstock Processor Sentenced to Five Years in Prison for Conspiracy to Commit Biofuel Fraud (April 7, 2017) (https://www.justice.gov/opa/pr/new-jersey-feedstock-processor-sentenced-five-years-prison-conspiracy-commit-biofuel-fraud).

18

an approved purpose, in addition to Western Dubuque's failure to use it for an approved purpose, required NGL to retire the RINs that it received with the biodiesel.

### 3. Designation of the biodiesel as a feedstock

NGL argues that "a material factual dispute exists about which entity, [NGL] or Western Dubuque," designated the biodiesel as a feedstock. Resistance to First Government Motion at 20. The regulation does not define "designate" and, as such, the court assigns the word its ordinary meaning. *See United States v. Jungers*, 702 F.3d 1066, 1071 (8th Cir. 2013) ("When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning." (quotation omitted)). To "designate" ordinarily means "[t]o choose (someone or something) for a particular job or purpose." Designate, *Black's Law Dictionary* (10th ed. 2014). In this case, it is undisputed that NGL entered into the biodiesel reprocessing arrangement which specifically contemplated that it would sell Western Dubuque biodiesel to be used as a feedstock. NGL called the biodiesel a "feedstock" and provided it to Western Dubuque to be used as a feedstock. *See* First Government Motion SUMF ¶¶ 8, 9; Second Government Motion Appendix at 13-21 (agreements regarding the biodiesel reprocessing arrangement stating that NGL would provide "methyl ester" for use as a feedstock), 55 (NGL's November 13, 2014 Supplemental Response to the EPA's July 15, 2014 Clean Air Act Information Request stating that NGL "supplied feedstock to Western Dubuque" and "purchased biodiesel from" Western Dubuque that has been "produced using the feedstock supplied by" NGL). Thus, NGL changed the purpose of the biodiesel from fuel to feedstock. This constitutes a "designation" of the fuel under the ordinary meaning of the word.

Rulemaking documents associated with the EPA's promulgation of the regulations support this interpretation. With respect to another provision of § 80.1429, the EPA explains that "if a party intends to separate RINs" from a volume of fuel or fuel blend that it intends to transfer, "the party must designate the blend for use as transportation fuel,

19

heating oil, or jet fuel." *See* 75 Fed. Reg. 14670-01, 14726, 2010 WL 1130808 (Mar. 26, 2010). "The party is also required to maintain records of this designation . . . [and] notify downstream parties that the volume of fuel has been designated for use as transportation fuel, heating oil, or jet fuel, and must be used in that designated form without further blending." *Id.* While this illustration does not specifically address § 80.1429(f), it does demonstrate that the EPA placed the onus for designating a renewable fuel for a proper use on the party separating the RINs from the fuel. In this case, NGL, after separating RINs from the biodiesel, not only failed to ensure that downstream parties used the fuel for a designated purpose, it specifically entered into an agreement with Western Dubuque to use the fuel for an unapproved purpose. Therefore, there is no genuine dispute over which entity designated the biodiesel as feedstock.

### 4. Number of RINs

NGL also disputes the government's allegation that NGL received, and separated, 35,813,309 RINs with the biodiesel it sold to Western Dubuque. *See* Resistance to First Government Motion at 28 (relying on NGL's expert's review of the records). NGL contends that it only received and separated 35,723,612 RINs. *Id.* The court, therefore, finds that there is no dispute that NGL received, and should have retired, 35,723,612 RINs, but that a genuine dispute exists regarding a total of 89,697 RINs.

### 5. Summary

The court concludes that NGL's failure to designate the biodiesel for an approved purpose, in addition to Western Dubuque's failure to use it for an approved purpose, required NGL to retire the RINs that it received with the biodiesel pursuant to § 80.1429(f). The court determines that the government is entitled to summary judgment on the undisputed 35,723,612 RINs that NGL failed to retire. A material dispute exists regarding the remaining 89,697 RINs. Accordingly, the court shall grant in part the First Government Motion with respect to the undisputed 35,723,612 RINs and deny it in part

with respect to the remaining 89,697 RINs.  The court shall deny the NGL Motion as to Count 1.

### D.  Count 7

In Count 7 of the Second Amended Complaint, the government alleges that NGL "caused" Western Dubuque to commit unlawful acts, in violation of 40 C.F.R. § 80.1460(e).  Second Amended Complaint ¶¶ 113-18.  Section 80.1460(e) provides that "[n]o person shall cause another person to commit an act in violation of any prohibited act under this section."  40 C.F.R. § 80.1460(e).  The court has previously held that "cause" should be given its ordinary meaning, which requires that the government establish that NGL brought about or effected Western Dubuque's actions.  *See* May 24, 2017 Order at 14.  The court concluded that "cause" did not require the government to prove that NGL controlled, coerced, misled or dictated Western Dubuque's actions.  *See id.*  Thus, to establish that NGL violated § 80.1460(e), the government must prove that: (1) Western Dubuque committed an act violating the Clean Air Act and (2) that NGL "caused" Western Dubuque's violation.  *See* 40 C.F.R. § 80.1460(e).

NGL argues that: (1) the Amended Consent Decree prevents the court from finding that Western Dubuque violated the regulations; (2) there is a material factual dispute over whether Western Dubuque violated the regulations; and (3) there is a factual dispute over whether NGL caused Western Dubuque's alleged violations.  *See* Resistance to Second Government Motion at 16-25.  The court shall address each argument in turn.

#### 1.  Amended Consent Decree

NGL notes that, to find it liable under § 80.1460(e), the court must first find that Western Dubuque committed an act in violation of the RFS2 regulations.  *See* Brief in Support of NGL Motion at 11-12; *see also* 40 C.F.R. § 80.1460(e) ("No person shall cause another person to commit an act in violation of any prohibited act under this section.").  NGL argues that, because the Amended Consent Decree did not include a

finding that Western Dubuque committed a violation of the RFS2 regulations and was a final judgment, the doctrine of res judicata precludes the government from proving this essential element. *See* Brief in Support of NGL Motion at 11-12.

"Res judicata, or claim preclusion, operates to preclude a party from relitigating the same cause of action." *Wedow v. City of Kan. City*, 442 F.3d 661, 669 (8th Cir. 2006). "Claim preclusion applies when there is a prior judgment rendered by a court of competent jurisdiction, that prior judgment was final and on the merits, and it involved the same cause of action and the same parties or privies." *Id*. "Res judicata bars claims that were or could have been litigated in the earlier proceeding . . . ." *Id*.

While NGL styles its defense as one of res judicata, the court notes that NGL's argument is, in substance, issue preclusion. Issue preclusion "bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748-49 (2001)). NGL does not contend that Count 7 was actually decided in the Amended Consent Decree. Rather, NGL argues that an issue of fact and law, i.e. whether Western Dubuque violated the RFS2 regulations, was determined in the Amended Consent Decree. Issue preclusion, also known as collateral estoppel, has five elements:

> (1) the party sought to be precluded in the second suit was a party . . . in the prior suit; (2) the issue sought to be precluded is the same as the issue involved in the prior action; (3) the issue was "actually litigated" in the prior action; (4) the issue was determined by a valid and final judgment; and (5) the determination in the prior action was "essential to the judgment"

*Turner v. U.S. Dep't of Justice*, 815 F.3d 1108, 1111 (8th Cir. 2016) (alteration in original) (quoting *Morse v. Comm'r*, 419 F.3d 829, 834 (8th Cir. 2005)).

The court concludes that, whether framed as claim or issue preclusion, preclusion

is inapplicable in the case for three reasons. First, the Amended Consent Decree did not contain a final decision on the merits, or constitute a valid and final judgment, finding that Western Dubuque did not violate the RFS2 regulations. *See generally* Amended Consent Decree. The Amended Consent Decree simply contained a statement that Western Dubuque did "not admit to any violations and/or any liability," without demonstrating any intent to treat Western Dubuque's non-admittance of guilt as a final determination on the merits. *Id.* at 4. This non-admittance of guilt has no preclusive effect in the absence of evidence showing that the government and Western Dubuque intended to foreclose this issue in future litigation. *See United States v. Brekke*, 97 F.3d 1043, 1049 (8th Cir. 1996) ("[T]he general rule is that a consent judgment has no issue-preclusive effect unless it is clearly shown that the parties intended to foreclose a particular issue in future litigation.").

Second, NGL was not a party to the Amended Consent Decree or in privity with Western Dubuque. It is undisputed that NGL and Western Dubuque are separate companies that were represented by separate counsel; there is no claim that the parties were privies. *See* Supplemental SUMF in Support of Government Resistance to NGL Motion (docket no. 166-3) ¶¶ 1-4. NGL was not a party to the Amended Consent Decree. *See* April 11, 2017 Order at 8, 14 (noting that "NGL is not bound by the Amended Consent Decree and is free to pursue a separate settlement or defend against the government's allegations," and that "[a]ll claims against NGL remain pending before the court"). As such, NGL cannot rely on any preclusive effect of the Amended Consent Decree. *See Lane v. Peterson*, 899 F.2d 737, 741-42 (8th Cir. 1990) ("The doctrine of res judicata . . . continues to include the requirement that only parties or privies to parties bound by the first judgment may rely on its preclusive effect."); *see also Pure Country, Inc. v. Sigma Chi Fraternity*, 312 F.3d 952, 958 (8th Cir. 2002) ("[S]trangers to a consent decree generally do not have standing to enforce a consent decree.").

Finally, as NGL admits, preclusion does not apply because the Amended Consent

23

Decree was entered in this same action. As the Eighth Circuit Court of Appeals has stated, "[r]es judicata bars claims that were or could have been litigated in [an] earlier proceeding," not claims within the same proceeding. *Wedow*, 442 F.3d at 669; *see also Robinson v. City of Harvey, III*, 617 F.3d 915, 916 (7th Cir. 2010) ("[I]ssue and claim preclusion concern the effect of one suit on a later suit and have nothing to do with how issues are resolved within a single case."). NGL contends that the court should still apply "the principles underlying the doctrines of" issue and claim preclusion because "it is appropriate to prevent 'parties from contesting matters they have had a full and fair opportunity to litigate.'" Reply in Support of NGL Motion at 3 (quoting *Arizona v. California*, 460 U.S. 605, 619 (1983)). The court declines to adopt this reasoning because the government has not had a full and fair opportunity to litigate the claims against NGL in this case.

Accordingly, the court concludes that the Amended Consent Decree does not preclude the government from litigating an essential element of Count 7

### 2. *Western Dubuque's alleged violations*

The government contends that Western Dubuque violated the Clean Air Act by: (1) using an improper feedstock to generate RINs; (2) introducing into commerce a renewable fuel produced from a feedstock not described in its registration information; and (3) creating and transferring invalid RINs. *See* Brief in Support of Second Government Motion (docket no. 137-1) at 5-6. The government argues that "[e]ach of these actions are prohibited acts in violation of 40 C.F.R. § 80.1460." *Id.* at 6. NGL argues that none of Western Dubuque's alleged acts constitute a violation of the Clean Air Act. *See* Resistance to Second Government Motion at 16-20.

### a. *Generation of RINs*

The government contends that Western Dubuque violated the regulations when it generated RINs for biodiesel it produced using an improper feedstock. *See* Second

24

Amended Complaint ¶¶ 79-84. Section 80.1426(c)(6) provides that "[a] party is prohibited from generating RINs for a volume of fuel it produces if . . . [t]he fuel does not meet the requirements of paragraph (a)(1) of this section." Paragraph (a)(1) states: "To the extent permitted under . . . this section, producers and importers of renewable fuel must generate RINs to represent that fuel if the fuel . . . [q]ualifies for a D code . . . or [the] EPA has approved a petition for use of a D code . . . ." 40 C.F.R. § 80.1426(a)(1). For a renewable fuel to qualify for a particular D code, it must be produced using certain "feedstock" substances and certain production processes. *See* 40 C.F.R. § 80.1426 Table 1. It is undisputed that neither biodiesel nor methyl ester are listed as qualifying feedstocks, *see id.*, and that Western Dubuque did not petition to use either as a feedstock, *see* 40 C.F.R. §§ 80.1426(a)(1). Thus, the government argues, Western Dubuque was not allowed to generate RINs for the biodiesel it produced. *See* Brief in Support of Second Government Motion at 7.

NGL argues that, "although the words 'biodiesel' and '[methyl ester]' do not appear in Table 1, the vegetable and waste oils that are listed in Table 1 were considered, in 2011, to include substances and products such as [methyl esters] that were derived from those oils." Resistance to Second Government Motion at 17. NGL argues that the EPA's enforcement, industry understanding and its own understanding highlight this interpretation. *See id.* NGL further contends that this evidence precludes summary judgment and the court should not weigh the evidence in light of the factual conflicts. *See id.* at 18. Finally, NGL argues that, even if these actions violate the regulations, Western Dubuque was a "grandfathered" facility. *See id.* at 18.

As an initial matter, the court notes that regulatory interpretation is a matter of law, not a question of fact for the jury. *See Raymond S. v. Ramirez*, 918 F. Supp. 1280, 1284 (N.D. Iowa 1996) ("Whatever deference is accorded an agency's interpretation of a statute, interpretation is a question of law, not of fact."). The court determines, for the

25

same reasons it enumerated when ruling on the Motion to Dismiss, that the plain language of the regulations prohibited Western Dubuque from generating RINs for biodiesel produced using biodiesel or methyl ester as a feedstock. The plain language of § 80.1426(c)(6) prohibits RIN generation where a fuel fails to qualify for a D code under the standards enumerated at § 80.1426, Table 1 or under the petition mechanism at § 80.1416. *See* May 24, 2017 Order at 9-13 (discussing this interpretation in detail); *see also* 40 C.F.R. § 80.1426(c)(6)(i). A fuel produced from a renewable fuel feedstock would not qualify for a D code under the table provided at § 80.1426; accordingly, RINs could only be generated for such fuel upon petition to the EPA. *See* May 24, 2017 Order at 12; *see also* 40 C.F.R. § 80.1416. NGL's factual arguments are inapposite in light of the plain language of the regulation. To the extent that these arguments support a fair notice defense, the court will discuss them further below.[6]

It is undisputed that Western Dubuque used biodiesel, or methyl ester, as a feedstock to produce biodiesel. Neither biodiesel nor methyl esther qualify as a feedstock under § 80.1426(f). Western Dubuque attached RINs to the newly produced fuel despite the fact that it did not qualify for a D code under Table 1 and Western Dubuque never petitioned the EPA for use of an alternate feedstock or process. Thus, Western Dubuque's generation of RINs violated the applicable RFS2 regulations.

NGL argues that, even under this interpretation, there is a question of fact over

---

[6] NGL also argues that, when Sabine Biofuels applied to the EPA to use a new production process, it was allowed to use biogenic waste oils that had been converted to fatty free acids as a feedstock. *See* Resistance to Second Government Motion at 17. NGL contends that the way the EPA applied Table 1 suggests that products derived from listed feedstocks are included in Table 1. *Id.* NGL's argument in unconvincing for two reasons: (1) Sabine Fuels filed a petition under the petition mechanism at § 80.1416, which neither NGL nor Western Dubuque did; and (2) the EPA found that Sabine's feedstock qualified under an existing feedstock pathway—wastes, oils, fats, or grease. *See* Supplemental SUMF in Support of First Government Motion ¶ 27. Neither party argues that the EPA has similarly stated that biodiesel qualifies under an existing pathway.

26

whether Western Dubuque was a "grandfathered" facility and exempt from Table 1. *See* Resistance to Second Government Motion at 18. The "grandfathering" provisions, § 80.1403 and § 80.1426(f)(6), allow grandfathered facilities, under certain circumstances, to generate D6 RINs for fuel that would not otherwise qualify for a D code under Table 1. NGL's argument fails, however, because Western Dubuque did not produce D6 RINs pursuant to the grandfathering provisions. Rather, in 2011, Western Dubuque registered to use, reported using and produced D4 RINs under the pathways described in § 80.1426(f), Table 1. *See* Supplemental SUMF in Support of First Government Motion ¶¶ 34, 36. Western Dubuque was not registered to generate D6 RINs per § 80.1426(f)(6)(ii) and did not produce D6 RINs. *See* Government Response to SUMF in Support of Resistance to Second Government Motion (docket no. 184) ¶ 105; Appendix to Reply in Support of First Government Motion (docket no. 155-8) at 68-69 (EPA testimony regarding requirement that grandfathered facilities produce D6 RINs). Thus, Western Dubuque's production of D4 RINs in 2011 was not exempt from Table 1 under the grandfathering provisions.

Accordingly, the court concludes that Western Dubuque violated the relevant 2011 renewable fuel program regulations by generating RINs for biodiesel it produced using an improper feedstock.

### b. Introduction of RINs into commerce

The government also argues that "Western Dubuque violated 40 C.F.R. § 80.1460(b)(5) each time [that] it introduced into commerce a renewable fuel produced from a feedstock not described in its registration information." Brief in Support of Second Government Motion at 8. Section 80.1460(b)(5) prohibits the introduction "into commerce [of] any renewable fuel produced from a feedstock or through a process that is not described in the person's registration information." 40 C.F.R. § 80.1460(b)(5). In 2011, Western Dubuque was registered with the EPA, pursuant to 40 C.F.R. § 80.1450, to

27

produce biodiesel and D4 RINs using the transesterification process with the following feedstocks: soybean oil, waste oils/fats/greases, algal oil, non-food grade corn oil and oil from annual cover crops. *See* Second Government Motion SUMF ¶ 21. The government contends that, because neither biodiesel nor methyl ester were feedstocks identified in Western Dubuque's registration, Western Dubuque violated § 80.1460(b)(5) "each time [that] it introduced into commerce a renewable fuel produced from a feedstock not described in its registration information." Brief in Support of Second Government Motion at 8.

NGL contends that "the government's argument fails for the same reasons as its Table 1 argument—the feedstock words appearing on Western Dubuque's registration have a broader meaning." Resistance to Second Government Motion at 18. NGL also argues that the government has failed to establish that Western Dubuque sold a "renewable fuel." *Id.* at 19.

For the reasons previously discussed, the court concludes that Western Dubuque's registration did not identify biodiesel or methyl ester as feedstocks. As the EPA explained in the federal register, "[p]roducers must choose the appropriate D code from the lookup table in the regulations based on the fuel pathway that describes their facility" and "[t]he fuel pathway must be specified by the producer in the registration process." *See* 75 Fed. Reg. 14670-01, 14711, 2010 WL 1130808 (Mar. 26, 2010). Western Dubuque's registration clearly identified feedstocks and production processes listed in § 80.1426 Table 1. *See* 40 C.F.R. § 80.1426 Table 1. Western Dubuque, however, actually used biodiesel as the feedstock to produce biodiesel. The court has already determined that neither biodiesel nor methyl ester are feedstocks embraced by Table 1. *See also* May 24, 2017 Order at 12. Therefore, the undisputed facts establish that the biodiesel introduced into commerce by Western Dubuque was produced from a feedstock not described in its registration information, in violation of § 80.1460(b)(5).

28

The court also finds that there is no genuine dispute that the fuel produced by Western Dubuque was a renewable fuel within the meaning of § 80.1460(b)(5). The RFS2 regulations define renewable fuel at 40 C.F.R. § 80.1401. The biodiesel at issue was produced by Western Dubuque using feedstock provided by NGL. NGL admits that the feedstock it provided was a "renewable fuel" as defined in § 80.1401. *See* First Government Motion SUMF ¶¶ 4, 12; Response to First Government Motion SUMF ¶ 4. Additionally, NGL contends that the parties intended that the biodiesel produced by Western Dubuque would be of higher quality and have lower monoglyceride levels than the biodiesel NGL had provided to use as a feedstock. *See* NGL Motion SUMF ¶ 16. As such, it is undisputed that the feedstock Western Dubuque used was already a renewable fuel within the meaning of the regulations before Western Dubuque refined it into an allegedly higher quality renewable fuel. Western Dubuque also treated the biodiesel as a renewable fuel by generating RINs for it, albeit improperly, under § 80.1426. *See* 40 C.F.R. § 80.1426(a) (providing for RIN production for "renewable fuel"). NGL provides no evidence suggesting that the biodiesel produced by Western Dubuque was not a renewable fuel. As such, there is no genuine dispute that the fuel produced by Western Dubuque was a renewable fuel within the meaning of § 80.1460(b)(5).

Accordingly, the court concludes that Western Dubuque violated 40 C.F.R. § 80.1460(b)(5) by introducing into commerce a renewable fuel produced from a feedstock not described in its registration information.

### c.    *Transfer of RINs*

The government argues that Western Dubuque violated 40 C.F.R. § 80.1460(b)(2) each time it created or transferred an invalid RIN. *See* Brief in Support of Second Government Motion at 9. Section 80.1460(b)(2) prohibits the "creat[ion] or transfer to any person [of] a RIN that is invalid under § 80.1431." 40 C.F.R. § 80.1460(b)(2). Section 80.1431 lists a number of reasons that a RIN could be invalid, including if the RIN was

29

"improperly generated." 40 U.S.C. § 80.1431(a)(ix). The government argues that the RINs Western Dubuque created and transferred to NGL were improperly generated because they were produced using biodiesel as a feedstock. *See* Brief in Support of Second Government Motion at 8. NGL argues that the RINs were not improperly generated for the reasons argued in relation to the other violations. *See* Resistance to Second Government Motion at 20.

For the reasons stated above, the court finds that the RINs produced by Western Dubuque were improperly generated and, thus, Western Dubuque violated 40 C.F.R. § 80.1460(b)(2) by creating and transferring the invalid RINs.

### 3. *Cause of violations*

Finally, the government argues that NGL caused Western Dubuque to violate the regulations by developing the biodiesel reprocessing arrangement, recruiting Western Dubuque to participate in the agreement, drafting the agreements between Western Dubuque and NGL, providing Western Dubuque with misleading legal analysis and withholding information from Western Dubuque about the potential risks of the agreement. *See* Brief in Support of Second Government Motion at 14. NGL contends that the government cannot establish liability because Western Dubuque acted independently of NGL, NGL was not the "but for" or "proximate cause" of Western Dubuque's violations and there is a genuine dispute as to whether NGL mislead Western Dubuque about the law or risks associated with the agreement. *See* Resistance to Second Government Motion at 20-25.

It is undisputed that NGL formulated the plan for the biodiesel reprocessing arrangement, and recruited Western Dubuque to use biodiesel as a feedstock and generate RINs for the reprocessed biodiesel. *See* Second Government Motion SUMF ¶ 23; Second Government Motion Appendix at 188, 195-96 (testimony of key NGL employees that NGL formulated the initial plan to produce two sets of RINs and presented it to Western

30

Dubuque); Response to Second Government Motion SUMF ¶ 23 (admitting that NGL "proposed" the biodiesel reprocessing arrangement to Western Dubuque); SUMF in Support of Resistance to Second Government Motion ¶ 7. NGL also sold biodiesel to Western Dubuque to be used as a feedstock . *See* First Government Motion SUMF ¶¶ 8-9; Second Government Motion Appendix at 13-21 (agreements regarding the biodiesel reprocessing arrangement stating that NGL would provide "methyl ester" for use as a feedstock), 55 (NGL's November 13, 2014 Supplemental Response to the EPA's July 15, 2014 Clean Air Act Information Request stating that NGL "supplied feedstock to Western Dubuque" and "purchased biodiesel from" Western Dubuque that has been "produced using the feedstock supplied by" NGL). Finally, it is undisputed that Western Dubuque sold the biodiesel and associated RINs back to NGL. *See* First Government Motion SUMF ¶ 16.

The court, however, finds that there are genuine disputes in the record regarding the extent to which NGL drafted the agreements between itself and Western Dubuque, provided Western Dubuque misleading legal analysis or withheld information about the potential risks of the agreement. The court will not considered these facts, about which there is a genuine dispute, when examining whether NGL "caused" Western Dubuque's violations. *See Amini*, 643 F.3d at 1074 ("A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case."). However, for the reasons discussed below, the court finds that consideration of the undisputed facts alone supports granting summary judgment.

Section 80.1460(e) provides that "[n]o person shall cause another person to commit an act in violation of any prohibited act under this section." 40 C.F.R. § 80.1460(e). Although "cause" is not defined in the regulations, the court has previously held that "cause," when given its ordinary meaning, requires the government to establish that NGL

brought about or effected Western Dubuque's actions. *See* May 24, 2017 Order at 14. The court has found that "cause" does not require the government to establish that NGL controlled, coerced, misled or dictated Western Dubuque's actions. *Id.* NGL provides no case law, and the court finds none, suggesting that the natural meaning of "cause," as used in the regulation, incorporates the tort-law concepts of proximate or but-for causation. *See Jungers*, 702 F.3d at 1071 ("When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning." (quotation omitted)). Rather, to establish "cause," the government must show that NGL brought about or effected Western Dubuque's violating actions.

The court concludes that the undisputed facts establish that NGL brought about or effected Western Dubuque's violating actions. It is undisputed that NGL developed and formulated the initial idea for the biodiesel reprocessing arrangement. NGL then recruited Western Dubuque to use biodiesel as a feedstock and generate RINs for the reprocessed biodiesel. Thus, NGL specifically recruited Western Dubuque to commit acts that, as discussed, violated the RFS2 regulations. After recruiting Western Dubuque, NGL facilitated Western Dubuque's continued violations by providing biodiesel to be used as a feedstock, and purchasing back the reprocessed biodiesel and newly attached RINs. There is no evidence in the record that Western Dubuque would have fabricated a similar scheme on its own or had the means to carry out such an arrangement. The undisputed facts are sufficient to establish that NGL caused Western Dubuque's violating acts.

Accordingly, the court concludes that NGL "caused" Western Dubuque to commit the above-discussed prohibited acts in violation of 40 C.F.R. § 80.1460(e).

### 4. Statute of limitations

NGL contends that its recruitment of Western Dubuque occurred in December 2010, and, as a result, the five-year statute of limitations expired in December 2015. *See* Resistance to Second Government Motion at 22. The "general federal statute of limitations

at 28 U.S.C. § 2462 applies" to claims for civil penalties under the Clean Air Act. *Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008, 1013 (8th Cir. 2010). "Section 2462 provides that 'an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture . . . shall not be entertained unless commenced within five years from the date when the claim first accrued . . . ." *Id.* at 1014 (alterations in original) (quoting 28 U.S.C. § 2462).

"A claim first accrues as soon as the right to institute and maintain a suit arises." *Id.* (quotation omitted). Section 80.1460(e) provides that "[n]o person shall cause another person to commit an act in violation of any prohibited act under this section." 40 C.F.R. § 80.1460(e). Accordingly, the government did not have a right to maintain a suit against NGL until Western Dubuque actually "commit[ted] an act in violation" of the regulation. *Id.* The government could not maintain a suit under § 80.1460(e) simply because NGL recruited Western Dubuque to violate the regulation. In this case, Western Dubuque began generating RINs under the agreement on January 26, 2011. *See* SUMF in Support of Resistance to Second Government Motion ¶¶ 24-25. This constituted Western Dubuque's first act in violation of the regulation and, therefore, the statute of limitations began running at that time. This means that the statute of limitations would have initially run out on January 26, 2016.

However, it is undisputed that the parties agreed that the period of January 1, 2016 through September 30, 2016, would not be included in computing the running of the statute of limitations. *See* Second Government Motion Appendix at 36-37 (Fifth Tolling Agreement for Claims under the Clean Air Act). The parties' agreement extended the statute of limitations to October 26, 2016. The government filed this suit on October 4, 2016. *See* Complaint. Accordingly, the statute of limitations does not bar Count 7.

### 5. *Summary*

The court concludes that Western Dubuque committed acts violating the RFS2

regulations and that NGL "caused" Western Dubuque's violations. Accordingly, the court shall grant the Second Government Motion and deny the NGL Motion as to NGL's liability for Count 7.[7]

### E. Count 8

In Count 8, the government alleges that NGL unlawfully transferred invalid RINs when it separated the RINs generated for the biodiesel produced by Western Dubuque and sold them to other obligated parties. *See* Brief in Support of First Government Motion at 12-15. Section 80.1460(b)(2) provides that: "[n]o person shall . . . [c]reate or transfer to any person a RIN that is invalid under § 80.1431." 40 U.S.C. § 80.1460(b)(2). Section 80.1431 enumerates a number of reasons that a RIN could be invalid, including if the RIN was "improperly generated." 40 U.S.C. § 80.1431(a)(ix). The government contends that, in 2011, Western Dubuque improperly generated 36,085,239 RINs and that NGL subsequently transferred those RINs to other obligated third parties. *See* Brief in Support of First Government Motion at 12-15. The only issue in dispute is whether Western Dubuque improperly generated RINs. Both the government's and NGL's arguments on this issue mirror their prior arguments. *See id.*; Resistance to First Government Motion at 21-28. For the reasons previously discussed, the court concludes that the plain language of the regulations prohibited Western Dubuque from generating RINs for biodiesel that was produced using biodiesel, or methyl ester, as a feedstock. The court further concludes that the consent decree does not preclude summary judgment on Count 8.

Accordingly, the court shall grant the First Government Motion and deny the NGL

---

[7] The court notes that the government again only seeks summary judgment on NGL's liability. *See* Brief in Support of Second Government Motion at 24. The government's request for a civil penalty or injunctive relief will be resolved through subsequent motions or at trial.

34

Motion as to NGL's liability for Count 8.[8]

### F. Fair Notice Doctrine

NGL argues that it is entitled to a fair notice defense because the regulations did not give fair warning of the prohibited conduct. *See, e.g.*, Resistance to Second Government Motion at 25-30. The government moves for summary judgment on NGL's fair notice defense on the grounds that the plain language of the regulations at issue gave NGL notice and that NGL had actual notice. *See* Brief in Support of Second Government Motion at 14-23.

"Under the fair notice doctrine, application of a rule may be successfully challenged if it does not give fair warning that the allegedly violative conduct was prohibited." *Qwest Corp. v. Minn. Pub. Utils. Comm'n*, 427 F.3d 1061, 1068 (8th Cir. 2005) (quotation omitted). "This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2007). "[A] regulation will pass constitutional muster even though it could have been drafted with more precision." *United States v. Pitt-Des Moines, Inc.*, 168 F.3d 976, 987 (7th Cir. 1999). Fair notice simply requires that the regulations "provide the kind of notice that will enable ordinary people to understand what conduct it prohibits." *Stahl v. City of St. Louis*, 687 F.3d 1038, 1040 (8th Cir. 2012) (quoting *City of Chi. v. Morales*, 527 U.S. 41, 56 (1999)).

### 1. Plain language of the regulations

The court begins its analysis of NGL's fair notice defense by examining the language of the regulations. *See Solis v. Summit Contractors, Inc.*, 558 F.3d 815, 823 (8th Cir. 2009) ("In examining the meaning of [a regulation], our inquiry begins with the

---

[8] The court notes that the government again only seeks summary judgment on NGL's liability. *See* Brief in Support of First Government Motion at 4 n.1. The government's request for a civil penalty or injunctive relief will be resolved through subsequent motions or at trial.

regulation's plain language. We look to see whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." (quotation omitted)). "If, by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with 'ascertainable certainty,' the standards with which the agency expects parties to conform, then the agency has fairly notified a petitioner of the agency's interpretation." *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995). "The inherent uncertainty of language often will impart some degree of vagueness to a statute, but that uncertainty alone does not mean that a statute is unconstitutional. Recourse to additional sources like dictionaries or judicial opinions may provide sufficient warning." *Neely v. McDaniel*, 677 F.3d 346, 350 (8th Cir. 2012).

Examining the relevant regulations, the court concludes that the plain language of the regulations provided fair warning to NGL that its conduct was prohibited. In regards to Count 1, the court has found that, under its plain language, § 80.1429(f) requires RIN retirement whenever a fuel is designated for an unapproved purpose at any stage. *See supra* Part VI.C; May 24, 2017 Order at 17-20. Section 80.1429(f)'s plain language provided notice to NGL that its failure to designate the biodiesel for an approved purpose required it to retire the RINs that it had received with the biodiesel.

Similarly, for Count 7, the plain language of § 80.1426(c)(6) prohibited RIN generation where a fuel failed to qualify for a D code under the standards enumerated at § 80.1426 Table 1 or under the petition mechanism at § 80.1416. *See supra* Part VI.D; May 24, 2017 Order at 14-17. A fuel produced from a renewable fuel feedstock would not qualify for a D code under the table provided at § 80.1426; accordingly, RINs could only be generated for such fuel upon petition to the EPA. *Id.* Thus, the regulations provided notice to NGL that Western Dubuque could be liable for violating the regulations if it generated RINs for biodiesel produced using biodiesel, or methyl ester, as a feedstock.

*Id.* The regulations similarly provided notice under § 80.1460(e) that NGL could be liable for causing Western Dubuque to commit prohibited acts. While "cause" was not defined in the regulation, its definition was easily ascertainable by reference to a dictionary. *See Neely*, 677 F.3d at 350. The regulations, thus, provided notice to NGL that its conduct, as alleged in Count 7, was prohibited.

Finally, for Count 8, § 80.1460(b)(2) provided that: "[n]o person shall . . . [c]reate or transfer to any person a RIN that is invalid under § 80.1431." 40 U.S.C. § 80.1460(b)(2). Section 80.1431 enumerates a number of reasons a RIN could be invalid, including if the RIN was "improperly generated." 40 U.S.C. § 80.1431(a)(ix). As discussed, the plain language of the regulations prohibited Western Dubuque from generating RINs for biodiesel produced using biodiesel, or methyl ester, as a feedstock. The plain language of § 80.1460(b)(2), then, provided notice to NGL that its conducted, as alleged in Count 8, was prohibited.

Accordingly, the court finds that the plain language of the regulations put NGL on notice of the proscribed conduct at issue and, therefore, NGL is not entitled to a fair notice defense on Counts 1, 7 or 8.

### 2. *Actual notice*

Further, even if the regulations were vague, the court finds that NGL had actual notice that it could face potential liability for its actions. The Tenth Circuit Court of Appeals has noted that "[a]ctual notice of an agency's interpretations . . . can meet the demands of fair notice." *See United States v. Richter*, 796 F.3d 1173, 1190 (10th Cir. 2015). Similarly, the Eighth Circuit Court of Appeals has, in the criminal context, favorably discussed the sufficiency of actual notice when the defendant argued that a statute was unconstitutionally vague but the evidence established that the defendant knew his conduct was illegal. *See United States v. Washam*, 312 F.3d 926, 930 (8th Cir. 2002) (noting that the "'actual notice' argument has some appeal and is supported by [the Tenth

Circuit]").  When a defendant "deliberately goes perilously close to an area of proscribed conduct it shall take the risk of crossing the line, as only a reasonable degree of certainty is necessary."  *United States v. Midwest Fireworks Mfg. Co.*, 248 F.3d 563, 568 (6th Cir. 2001) (alterations and quotations omitted).

In this case, NGL was informed on numerous occasions that its conduct could subject it to liability.  In November 2010, Larry Schafer asked Sandra Franco, outside counsel for the National Biodiesel Board, for advice concerning whether § 80.1426(c)(6) permitted a biodiesel plant to generate RINs when reprocessing a feedstock composed of biodiesel, for which RINs had previously been generated but removed.  *See* Second Government Motion SUMF ¶¶ 34-35.  Schafer was an independent board consultant, advisor to the National Biodiesel Board and a consultant to NGL.  *See* Government Response to SUMF in Support of Resistance to Second Government Motion ¶ 6.

Franco advised Schafer that because "it sound[ed] like the proposed scenario may result in both Plant 1 and Plant 2 generating RINs, and both RINs [would] be in the system" she did not "think that would be permissible as technically . . . you [would] have double RINs for essentially the same gallon of renewable fuel."  Second Government Motion SUMF ¶ 36.  Franco also stated that "[u]nder the [regulations], it could be that, if both plants could generate RINs, the RINs from Plant 1 would need to be taken out of the system (e.g., retired) because they were not used by Plant 2 for transportation fuel, heating fuel or jet fuel without further processing."  *Id.*  She continued, "I think the prohibition on generating RINS (sic) under (c)(6) is based on re-processing so that you don't get double RINs . . . so I think another reading is that the RINs would have to flow from Plant 1 to Plant 2 as the ultimate use of the biodiesel is for transportation fuel."  *Id.* (ellipsis in original).  Schafer subsequently provided this opinion to NGL.  *Id.* ¶ 37.[9]

_____

[9] On April 7, 2011, Schafer personally provided a memorandum to NGL that, while
(continued…)

On February 11, 2011, the law firm McDermott, Will & Emery provided NGL another analysis of the RFS2 regulations. *See id.* ¶ 40; Response to Second Government Motion SUMF ¶ 40. The analysis ultimately concluded that the arrangement was proper under the regulations. *See id.* However, the analysis warned that the double generation of RINs "would seem to contradict a fundamental tenet of the renewable fuels program: i.e., that to maximize the use of such fuels, they must not be 'double-counted' in the RIN system." Second Government Motion SUMF ¶ 41. The analysis went on to state:

> The consequences of this risk are what Gavilon must consider here. If my/our interpretation is declared wrong by EPA (or a Court), then there is a good chance that the second RINs assigned by the third-party processor (and sold to us with the B100 product, at a higher price) will be voided . . . . Gavilon may have sold that product with invalid RINs to another entity—a large refiner like ExxonMobil, for example—and find itself in the difficult position of returning money to compensate purchasers or, worse, may find itself named as a defendant in litigation for breach of contract or warranty, business fraud, negligence, etc. Moreover, if a company like ExxonMobil relied on those invalid RINs to fulfill its own renewable mandate with the government, it may be liable for penalties that it almost certainly would seek to pass along to Gavilon . . .
>
> (BTW, one potential way around a lot of this risk is to demand written/contractual assurances and warranties from the third-party processor as to the validity of the RINs it is assigning to its re-processed B100 product, and an indemnity against any claim or cause of action that might arise from the RINs being declared invalid).

Second Government Motion Appendix at 107.

---

[9](…continued)
approving aspects of the biodiesel reprocessing arrangement, also stated that "[i]t is important . . . to note that RINs not be generated on the first processing of the feedstock." Second Government Motion Appendix at 121.

39

Finally, internal communications within NGL further highlight NGL's awareness of the potential liability it could face for its actions. On January 19, 2011, Vangilder, who had initially met with Western Dubuque, sent the following messages to Neil Camp, an employee in the Renewable Fuels Division, about the biodiesel reprocessing arrangement:

| | | |
|---|---|---|
| Sent: | 01/19/11 03:23:48PM | not sure what I got myself into here ..... fak |
| Recv: | 01/19/11 03:24:05PM | export ethanol or the owensboro deal? |
| Sent: | 01/19/11 03:28:15PM | The "Rin Machine" |
| Sent: | 01/19/11 03:30:27PM | its (sic) like double top secret stuff....... |
| Recv: | 01/19/11 03:30:52PM | I'll make sure to bring in the clowns tomorrow.... |
| Sent: | 01/19/11 03:31:01PM | Could be wearing orange or strips (sic) soon.... |
| Recv: | 01/19/11 03:31:24PM | better check your list of no extradition countries |
| Recv: | 01/19/11 03:31:37PM | surely there is an island somewhere you can hide out and fish all day |
| Sent: | 01/19/11 03:32:38PM | I've got enough emails that should bail me out.....I'm thinking of I might just bcome (sic) a whistle blower and take my cut of 10% of the fine.... |

Second Government Motion SUMF ¶ 60.[10]

The court finds that these communications, in their totality, highlight NGL's knowledge of the risk induced in its scheme. While NGL may have received some opinions suggesting that its actions were allowed under the regulations, it also received clear warning that its interpretation of the RFS2 regulations could lead to liability. NGL

_____

[10] "Sent" messages were sent by Vangilder, while "Recv" messages were sent by Camp.

could have used the petition process maintained by the EPA at § 80.1416 to ensure its actions were proper. Instead, NGL took a calculated risk with full awareness of the potential liability. The fair notice doctrine does not protect against risks knowingly taken. *See Midwest Fireworks Mfg.*, 248 F.3d at 568 ("When a [defendant] deliberately goes perilously close to an area of proscribed conduct it shall take the risk of crossing the line, as only a reasonable degree of certainty is necessary.").

Accordingly, the court concludes that NGL had actual notice of the potential liability associated with its actions and is not entitled to a fair notice defense on Counts 1, 7 or 8.

### 3. *Declaration of James Pardo*

In support of its fair notice defense, NGL submitted a declaration from its counsel, James Pardo, asserting that he called an EPA hotline in early 2011 to ask if RINs could be generated under the facts of this case. *See* Appendix to Resistance to Second Government Motion (docket no. 172-8) at 55. The person staffing the hotline did not answer Pardo's question and the EPA did not contact Pardo about his question. *See id*. The government filed a "Motion to Strike" (docket no. 175) the declaration because NGL failed to timely disclose Pardo as a witness. *See* Motion to Strike at 1. The court finds that, in light of the above, the declaration would not change its analysis. As such, the Court shall deny the Motion to Strike. If necessary, the government may re-raise this issue in advance of trial.

### G. Selective Prosecution

The government seeks summary judgment on NGL's selective prosecution defense. *See* Brief in Support of Second Government Motion at 23. To establish a selective prosecution defense, NGL must show that "they were singled out for prosecution while similarly situated individuals have not been prosecuted for similar conduct" and "that the government's discriminatory selection is based on an impermissible ground such as race,

41

religion, or the exercise of constitutional rights." *United States v. Aanerud*, 893 F.2d 956, 960 (8th Cir. 1990). NGL states that government misunderstands its defense and asks the court to consider "disparate treatment in assessing any remedy that might be imposed for any violations that it may find, regardless of whether NGL can sustain a formal selective prosecution defense." Resistance to Second Government Motion at 30-31. The court finds that there is no evidence of any discriminatory selection based on an impermissible ground. As such, the court will grant summary judgment on any formal selective prosecution defense raised by NGL. NGL may raise the underlying basis of its argument when addressing the proper remedy.

## VII. CONCLUSION

In light of the foregoing, the government's First Motion for Partial Summary Judgment (docket no. 79) is **GRANTED IN PART** and **DENIED IN PART**. The government's Second Motion for Partial Summary Judgment (docket no. 137) is **GRANTED**. NGL's Motion for Summary Judgment (docket no. 138) is **DENIED**. The Motion to Strike (docket no. 175) is **DENIED**. The court makes no determination regarding the Second Amended Complaint's request for civil penalties or injunctive relief. The issue of the appropriate relief in this case will continue to trial.

**IT IS SO ORDERED.**

**DATED** this 3rd day of July, 2018.

LINDA R. READE, JUDGE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA